IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY MEDNICK and STEVEN BAYER, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>PRECOR, INC., a Delaware Corporation,<br><br>     Defendant. | Case No. 14 C 3624<br>CONSOLIDATED ACTION<br><br>Judge Harry D. Leinenweber |

MEMORANDUM OPINION AND ORDER

Presently before the Court are Plaintiffs' Motion for Class Certification [ECF No. 86], and Defendant's Motion to Strike and Exclude Opinion of Plaintiffs' Expert Craig Henriquez, Ph.D. [ECF No. 100]. For the reasons stated herein, Defendant's Motion is granted, and Plaintiffs' Motion is denied.

I. BACKGROUND

On May 16, 2014, Plaintiff Gary Mednick ("Mednick") filed this class action lawsuit against Defendant Precor, Inc. ("Precor") on behalf of himself and other similarly situated individuals seeking to remedy unfair and deceptive business practices arising from Precor's marketing and sale of exercise equipment incorporating "touch sensor heart rate" monitoring

technology. Plaintiff Steven Bayer ("Bayer") filed a separate lawsuit alleging similar claims. Subsequently, the two cases were consolidated before this Court.

Mednick and Bayer both purchased Model 9.23 treadmills manufactured by Precor. The Model 9.23 treadmill includes a Touch Sensor Heart Rate System (the "Touch Sensors") that measures a user's heart rate when gripping handle sensors. The Touch Sensors in Model 9.23 treadmills are manufactured by Alatech, one of Precor's three suppliers of heart rate monitoring systems. Alatech Touch Sensors, along with sensors manufactured by Polar and Salutron, are included on nineteen additional Precor machines: four treadmills, eight elliptical machines, one adaptive motion trainer ("AMT") elliptical machine, and six stationary bikes. Both Plaintiffs found that their treadmills' Touch Sensors failed to provide accurate heart rate readings. According to the Complaints, the Touch Sensors on all 20 machines contain the same defect.

Precor's nationwide marketing campaign uniformly advertises the benefits of its Touch Sensors across its various fitness machines. For all of its product lines, Precor's product brochures highlight the Touch Sensors. For example, the product brochure for the 9.23 Treadmill invites the consumer to "[m]aximize your workout results with touch sensor heart rate monitoring." Pls.' Mem. Supp., Ex. 9. These brochures, created

by Precor, are sent directly to third-party retail stores for the purpose of: (1) training sales personnel to learn about product features; (2) preparing sales representatives to speak with and sell Precor exercise equipment to consumers; and (3) providing point-of-sale marketing materials to potential purchasers. Precor makes similar representations on its website.

Precor's Touch Sensors are intended to measure the user's heart rate by registering the small electrical signals carried across the surface of the user's skin each time his or her heart contracts. However, Precor cautions that not all users will get the same or even valid results when using the Touch Sensors. This is because the Touch Sensors are biomechanical devices subject to highly variable users. On its website, Precor states:

> Touch heart rate readings depend on a strong, clear
> pulse to be read from your hands. In order to
> generate a clear signal, gently grasp the sensors. Do
> not tightly squeeze them, as this will negatively
> affect the pulse in your hands, making it more
> difficult for the sensors to get a good reading. The
> sensors will be more successful if your hands are warm
> and moist. . . . Touch heart rate is affected by an
> individual's physiology. Some people have stronger
> pulse in their hands compared to others. Your results
> may vary.

Def.'s Mem. Opp., Ex. 9. The owner's manuals contain a similar cautionary statement. For example, Bayer's owner's manual states:

>Touch heart rate performance may vary based on a
>user's physiology, age, and other factors. You may
>experience an erratic readout if your hands are dry,
>dirty or oily, or if the skin on your hands is
>especially thick. . . .

Pls.' Mem. Supp., Ex. 14. Similarly, Mednick's owner's manual

contained the following disclaimer:

>Usually, the concentration of salts in a person's
>perspiration provides enough conductivity to transmit
>a signal to the receiver inside the display console.
>However, some people, because of body chemistry or
>erratic heart beats cannot use the touch sensitive
>heart rate feature on the treadmill.

Def.'s Mem. Opp., Ex. 10.

Both parties have presented expert testimony on the Touch

Sensors ability to provide accurate heart rate information.

Plaintiffs' expert, Dr. Craig S. Henriquez ("Henriquez"), is a

professor of biomedical engineering of nearly 30 years who

currently teaches at Duke University. Henriquez offers the

opinion that "motion artifact," or the actual movement of the

user while exercising, "can disrupt the measurement of" the

electrical currents produced by the human body "and result in a

miscalculated heart rate." Henriquez concludes that "exercise

equipment like the tested Precor products, which rely on metal

handgrip sensors, provide inherently unreliable heart rate data"

due to motion artifact noise and physiological differences among

the user population.

Henriquez reached this opinion after reviewing the relevant literature and Precor's own documents and materials. He also relied on his experience and specialized knowledge, and his independent research. Henriquez collected data from one subject, Matthew Brown, "under typical conditions of walking and running" on Mednick and Bayer's personal treadmills and on another model — all three of which operate using an Alatech heart rate system. Henriquez ran tests comparing Mr. Brown's heart rate readings from a chest strap to those he recorded off the heart rate systems of the three Precor treadmills and compiled this data in support of his opinion in this case.

Precor's expert, Michael Garrett ("Garrett"), is the principal of Garrett Technologies, an advanced electrical and mechanical engineering software development and consulting firm that specializes in medical devices including electrocardiogram ("ECG") monitors, defibrillators, and external pacemakers. Garret has extensive experience and particular expertise in electrical and software engineering and testing of heart monitoring systems, including ECG systems. Precor asked Garrett to review and comment on Henriquez's expert report. In doing so, Garrett reviewed the relevant literature and performed independent testing on the 20 Precor machines at issue in this case. Garrett tested the Alatech, Salutron and Polar heart rate systems incorporated in Precor treadmills, elliptical machines

and stationary bikes.  He had 22 individuals of different ages, heights, weights, and cardio-physiologies use each of the various machines and compared the heart rate reading from a chest strap ECG worn by the user and the subject machines' Touch Sensors.

Garrett's research led him to conclude that the heart rate systems tested on the Precor machines at issue all perform as required for monitoring heart rate in an exercise environment, and are consistent with clinical ECG performance.  Garrett's data demonstrated that valid heart rate readings were displayed for each of the different machines tested.  But he noted that the rate of accuracy varied based on factors including the user's physiology, the machine being tested, the type and intensity of the motion, and the machine's incorporated heart rate system.

Garrett also concluded that Henriquez's testing did not support his broad conclusion that exercise equipment like the Precor products, which rely on metal handgrip sensors, provide inherently unreliable heart rate data.  Specifically, Garrett criticized Henriquez for only testing a single person on one heart rate system on a single type of exercise machine — a treadmill.  Garrett found that (1) each heart rate system is different; (2) the different heart rate systems — Alatech, Salutron, and Polar — operate based on unique, proprietary trade

secret or patented technology with different algorithms to receive, filter and convert electrical signals from a person's pulse into the heart rate displayed on the machine; (3) each type of exercise machine requires different amounts and types of bodily movements; and (4) individual users have varied physiology and physical attributes, and may grip hand sensors and use exercise equipment differently. Therefore, Garrett concluded that a deficiency noted based on the testing of one individual on two models of treadmills, both of which use the Alatech heart rate system, cannot be extrapolated to apply to *all* individuals on *all* heart rate systems across *all* types of Precor machines.

The proceedings have now reached the class certification stage. Plaintiffs seek class certification under FED. R. CIV. P. 23(a), 23(b)(2) and 23(b)(3) for breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, on behalf of a nationwide class, defined as:

> All persons within the United States who, within the applicable statute of limitations, purchased a Precor fitness machine equipped with a touch sensor heart rate monitor from either Precor or a third-party retailer. Excluded from the Nationwide Class are . . . those who purchased Precor fitness machines for resale.

Plaintiffs also seek class certification under FED. R. CIV. P. 23(a), 23(b)(2) and 23(b)(3) for violations of 10 state

consumer fraud laws, on behalf of a multi-state class, defined as:

> All persons who, within the applicable statute of limitations, purchased a Precor fitness machine equipped with a touch sensor heart rate monitor from either Precor or a third-party retailer. Excluded from the Multi-State Class are . . . those who purchased Precor fitness machines for resale.

Precor opposes the certification of both proposed classes and also asks the Court to strike and exclude Henriquez's expert opinion.

## II. __ANALYSIS__

### A. Motion to Strike

The Court first considers Precor's Motion to Strike and exclude Henriquez's expert opinion. *See, Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815-16 (7th Cir. 2010) ("[W]hen an expert's report or testimony is critical to class certification, as it is here . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion."). A plaintiff proffering expert testimony in support of class certification must demonstrate by a preponderance of the evidence that the expert's reasoning and methodology are valid and can be properly applied to the facts in issue. 1 *McLaughlin on Class Actions* § 3:14 (12th ed.).

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993). It is the Court's role to ensure that expert testimony is both relevant and reliable. *Daubert,* 509 U.S. at 589. To do so, the Court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *see also, Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010). Henriquez's qualifications are not at issue here; the reliability of his testimony is what Precor contests. Even the most "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert.*" *Clark v. Takata Corp.,* 192 F.3d 750, 759 n. 5 (7th Cir. 1999).

The reliability of Henriquez's testimony depends on whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert,* 509 U.S. at 592-93. *Daubert* sets forth the following non-exhaustive factors for assessing the reliability of an expert opinion: (1) whether the theory has been or is capable of being tested; (2)

whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Id.* at 593–94.

Precor argues that, due to Henriquez's failure to record or disclose the physiological characteristics of the sole subject, Mr. Brown, his opinion is unreliable, as it impossible for others to test Henriquez's theory. Precor also faults Henriquez's opinion for the lack of peer review. These criticisms miss the mark. Precor appears to confuse Henriquez's *opinion* — that exercise equipment like the tested Precor products, which rely on metal handgrip sensors, provide inherently unreliable heart rate data — with his *theory* — that motion artifact can disrupt the measurement of the electrical currents produced by the human body and result in a miscalculated heart rate. Indeed, Henriquez's failure to note Mr. Brown's physiological characteristics makes it difficult to repeat his testing and double check his resulting *opinion*, but this flaw in his methodology does not prevent his *theory* from being tested. Similarly, although Henriquez's *opinion* has not been subjected to peer review and publication, his *theory* has been the subject of numerous research papers and studies — many of which both parties' experts review and rely upon in forming their opinions in this litigation.

Precor's critiques of the methodology underlying Henriquez's opinion merit greater consideration. *See, Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir. 2002) ("A very significant *Daubert* factor is whether the proffered scientific theory has been subjected to the scientific method."). In addition to the *Daubert* factors discussed previously, the 2000 Advisory Committee's Notes to Rule 702 suggest other benchmarks for assessing an expert's methodology and opinion including, among other things: (1) whether the testimony relates to matters "growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (2) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) "[w]hether the expert has adequately accounted for obvious alternative explanations"; and (4) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting". FED. R. EVID. 702 Advisory Committee's Note (2000 amends.). Henriquez's opinion fails on each of these additional factors.

First, Henriquez's opinion did not grow naturally out of research he had conducted independent of this litigation. It was developed for the express purpose of Plaintiffs' class certification motion. In fact, when asked in his deposition

about some of the shortcomings of his methodology, Henriquez stated that he did not do a broader test of his theory because he had "[l]imited time to provide the information that was asked of [him]." Henriquez Depo. at 19-20.

Second, Henriquez's opinion fails to bridge the analytical gap between the basic principle that motion artifact may interfere with the measurement of the electrical currents produced by the human body and result in a miscalculated heart rate, and his conclusion that all exercise machines with metal handgrip sensors provide inherently unreliable heart rate data. He equates the *existence* of motion artifact, which is a well-documented condition present during exercise, with *uncompensated* motion artifact, which results when a piece of exercise equipment is unable to filter the motion artifact noise and provide a reliable heart rate reading. In doing so, Henriquez extrapolates from an accepted premise to an unsupported conclusion and leaves the Court with many questions as to how he got there.

Henriquez (and the relevant literature he relies on) acknowledges that a user's size, anatomy, position of the heart, body weight and composition, gender, and age, as well as the amount and type of bodily movement involved in the exercise, can all influence the presence of motion artifact and the accuracy of heart rate readings. Yet Henriquez conducted a test of a

single person on one heart rate system on one type of exercise machine — a treadmill. Without any testing of a larger population on other heart rate systems or other types of machines, Henriquez's opinion as to the accuracy of the heart rate monitors on all of Precor's exercise machines across all users is based on nothing more than speculation; this is not sufficient. *See, Daubert,* 509 U.S. at 590 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation.").

Plaintiffs make much of the fact that Henriquez's opinion is also supported by the relevant literature. But the literature Henriquez claims to rely upon is inconclusive in regard to the accuracy of the heart rate data gained through the use of metal handgrip sensors on exercise equipment. The literature does acknowledge the existence of motion artifact and the effect it can have on heart rate readings during exercise, but it also finds that Polar and Salutron heart rate systems compensate for this interference and provide reliable heart rate readings. *See,* Kay Study (Polar heart rate systems); Lee & Mendoza Study (Salutron heart rate systems). The remaining articles cited by Henriquez studied various chest straps rather than handle Touch Sensors, heart rate systems not used by Precor or at issue in this case, the existence of motion artifact generally, and how differing user physiology affects the

collection of heart rate data. Thus, none of the cited studies support Henriquez's broad opinion that *all* of the Precor products at issue provide inherently unreliable heart rate data to all users. Expert testimony relying on the opinions of others should be rejected if the testifying expert's opinion is too speculative or the underlying basis is faulty. *Walker v. Soo Line R. Co.,* 208 F.3d 581, 588 (7th Cir. 2000).

The shortcomings in Henriquez's methodology are also pertinent in light of the third and fourth additional reliability factors discussed above. By his own admission, Henriquez does not believe a sample size of one is sufficient to produce reliable results. *See, Am. Honda Motor Co.,* 600 F.3d at 818 (stating "a sample size of one is rarely, if ever, sufficient"). Thus, the fact that he utilized such a small sample size suggests that he was not as careful in conducting his study for this litigation as he would be in his regular professional research. *See, id.* ("The small sample size also highlights the constraints litigation placed upon [the expert's] methods and professional judgment; [he was] not being as thorough as he might otherwise be. . . ."). By failing to test more than one subject and failing to record the physiological details of Mr. Brown, Henriquez also failed to account for the alternative explanation that Mr. Brown may simply be an outlier, or a person who, due to his physiology, is not representative of

a statistical sample of subjects. Similarly, by only testing treadmills equipped with Alatech heart rate systems, Henriquez failed to account for the possibility that his results may be attributable only to that particular heart rate system or the bodily movements associated with exercise on a treadmill.

"'[S]haky' expert testimony may be admissible, assailable by its opponents through cross-examination," *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010), but the testimony proffered here is not merely shaky: it is unreliable. The *Daubert* standard and Rule 702 are designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Chapman,* 297 F.3d at 688. Henriquez's opinion simply does not satisfy this standard of reliability. The Court therefore grants Defendant's Motion to Strike.

### B. Motion for Class Certification

To succeed on their Motion for Class Certification, Plaintiffs must show that the putative classes satisfy all four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation, and any one of the conditions of Rule 23(b). FED. R. CIV. P. 23; *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). Plaintiffs request certification under Rule 23(b)(2), which states that a class action may be

maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Plaintiffs also seek certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over questions affecting only individual members and that the class action is the best method for adjudicating the controversy fairly and efficiently. FED. R. CIV. P. 23(b); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997).

Plaintiffs contend that Precor committed consumer fraud and breached its written warranties by falsely and misleadingly marketing the Touch Sensors as a premium feature on the 20 Precor machines at issue despite knowing that they were "inherently defective." Thus, they contend that the central questions at issue here are whether: (1) the Precor machines suffer from common design defects; (2) Precor falsely and misleadingly markets its Touch Sensor feature with knowledge of these defects; and (3) Precor committed consumer fraud and/or breached its written warranties by selling defective products. The Court agrees that these three questions are central to the case and common to all members of the putative classes. But the Court does not agree that these common questions

predominate over issues that vary among the members of the classes. *See,* FED. R. CIV. P. 23(b)(3).

The predominance inquiry under Rule 23(b)(3) "'trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 814 (7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). Predominance is similar to Rule 23(a)'s typicality and commonality requirements, but "the predominance criterion is far more demanding." *Id.* (internal quotation marks omitted).

Generally, predominance is satisfied when "'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'" *Id.* (quoting *7AA Wright and Miller, Federal Practice & Procedure* § 1778 (3d ed. 2011)). In other words, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted). The presence of some individual questions is not fatal, but individual questions cannot predominate over the common ones. *Id.* To determine if a question is common, Plaintiffs' must demonstrate that the elements of their claims are capable of

- 17 -

proof at trial "through evidence that is common to the class rather than individual to its members." *Id.* at 818 (citation omitted); *accord, Costello v. BeavEx, Inc.,* 810 F.3d 1045, 1060 (7th Cir. 2016) ("Plaintiffs have demonstrated that common questions predominate by making out a prima facie claim under the IWPCA based on evidence common to the class.").

Plaintiffs cannot meet this burden on the issue of whether Precor machines suffer from common design defects. Relying on Henriquez's opinion, Plaintiffs make the leap from the *existence* of motion artifact to the conclusion that *all* of the 20 Precor machines are defective because the Touch Sensors are unable to compensate for this condition and provide a reliable heart rate reading. But this allegation is as unsubstantiated as the expert opinion upon which it rests. Such a determination cannot be made for all members of the putative class in a single adjudication, but rather would require individualized inquiry into each user, each type of machine and each heart rate system at issue.

The flaws in Plaintiffs' stance are further amplified when the Court removes Henriquez's opinion from the discussion. Without it, Plaintiffs are left with only the deposition testimony of Steven Bayer and an affidavit of Gary Mednick, which in no way support the broad-reaching conclusions urged by Plaintiffs as to all types of users across all types of Precor

machines. The other evidence Plaintiffs offer is of no help to them either, as it is relevant only to prove the existence of a warranty, Precor's knowledge of issues with the Touch Sensors, and damages.

The opinion of defense expert Garrett is the only other evidence in the record pertaining to the reliability of the Touch Sensors on the 20 Precor machines at issue. Garrett opines that the Touch Sensors all perform as required for exercise heart rate monitors and are consistent with clinical ECG performance. Garrett acknowledges that the rate of accuracy varies based on factors including the user's physiology, the system being tested, the type and intensity of the exercise performed, and the heart rate system included in the machine. Indeed, he even admits the Touch Sensors may not work at all for some users. But such unpredictability is exactly the reason why certification of the proposed classes is inappropriate.

If the Touch Sensors are, in fact, unreliable, is that unreliability attributable to a defect, or simply to human error? Or is the unreliability due to some external factor, like the user's age? Or their body mass? Or weight? Or their cardio-physiology? Or the thickness or dryness of the skin on their hands? Or their average rate of exercise? And if the product proves to be defective, is that defect present only on a certain type of machine (treadmill, elliptical, AMT, or

stationary bike)? Or is it attributable to a specific heart rate system (Alatech, Salutron, or Polar)? These questions make the common issue of whether the Precor Touch Sensors are defective incapable of being proven at trial "through evidence that is common to the class rather than individual to its members." The Court cannot even begin to contemplate the number and makeup of the subclasses and sub-subclasses that would be necessary to facilitate disposition of the proposed classes' claims.

This case is analogous to *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1015 (7th Cir. 2002), in which the Seventh Circuit reversed the district court's order certifying two nationwide classes in a products liability action brought against the manufacturers of sport utility vehicles and the tires used on SUVs. Plaintiffs alleged that the tires had an abnormally high failure rate and were designed or manufactured defectively. *Id.* The court found that differences in the use of the SUVs, attributes of the various tire designs, treatment of the tires by the users, and other external factors (like differing climates) all affected the failure rate of the products. *Id.* at 1019. These variables precluded the court from finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to

other available methods for the fair and efficient adjudication of the controversy." *Id.* (citing FED. R. CIV. P. 23(b)(3)).

The nature of Plaintiffs' claims also prevents the Court from finding Rule 23(b)(3) satisfied. Specifically, Plaintiffs seek to certify a multi-state class to pursue violations of the consumer fraud laws of 10 states and a nationwide class action under the Magnuson-Moss Warranty Act. "A nationwide class in what is fundamentally a breach-of-warranty action, coupled with a claim of fraud, poses serious problems about choice of law, the manageability of the suit, and thus the propriety of class certification." *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 674 (7th Cir. 2001); *see also, In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995). The Seventh Circuit has made clear that multi-state fraud and warranty class actions are not appropriate, especially in the context of multiple products because such actions require the application of numerous, materially different state laws. *See, In Re Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748, 752 (7th Cir. 2011); *In Re Bridgestone/Firestone,* 288 F.3d at 1020 ("[O]nly 'a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions' will yield the information needed for accurate evaluation of mass tort claims." (internal citation omitted)).

Nor may Plaintiffs' proposed classes be certified under Rule 23(b)(2). Rule 23(b)(2) was "not intended to apply where the appropriate final relief relates exclusively or predominantly to money damages." *Rota v. Bhd. of Ry., Airline & S.S. Clerks,* 64 F.R.D. 699, 707 (N.D. Ill. 1974). Although Plaintiffs invoke various legal theories, they have only one cognizable injury — the alleged over-payment for their Precor machines due to the "premium" yet defective Touch Sensor feature — and prospective injunctive relief is not a proper remedy for that kind of injury. This is simply an action for damages, not the dual remedies of an injunction plus damages. *See, Kartman v. State Farm Mut. Auto. Ins. Co.,* 634 F.3d 883, 888-89 (7th Cir. 2011).

Moreover, Plaintiffs cannot satisfy the test for a remedy in equity. An injunction requires a showing that: (1) plaintiffs have suffered irreparable harm; (2) monetary damages are inadequate to remedy the injury; (3) an equitable remedy is warranted based on the balance of hardships between plaintiffs and defendant; and (4) the public interest would be well served by the injunction. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). If Plaintiffs were able to prove their claims, monetary damages would adequately remedy any injury suffered by an individual member or the class as a whole. This type of action is appropriate only under Rule 23(b)(3); because

Plaintiffs have failed to satisfy the requirements under that rule, the Court denies their Motion for Class Certification.

### IV.   <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Strike and Exclude Opinions of Plaintiffs' Expert Craig Henriquez, Ph.D. [ECF No. 100] is granted. Plaintiffs' Motion for Class Certification [ECF No. 86] is denied.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Dated:6/10/2016