**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GARY MEDNICK, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | Case No. 1:14-cv-03624 |
| Plaintiff, | ) | CONSOLIDATED ACTION |
| | ) | |
| v. | ) | |
| | ) | Hon. Harry D. Leinenweber |
| PRECOR INC., a Delaware corporation, | ) | |
| | ) | Magistrate Judge Daniel G. Martin |
| Defendant. | ) | |
| STEVEN BAYER, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRECOR INC., a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR RENEWED MOTION FOR CLASS CERTIFICATION**

---

**LITE DEPALMA GREENBERG, LLC**
Katrina Carroll, Esq.
*kcarroll@litedepalma.com*
Kyle A. Shamberg, Esq.
*kshamberg@litedepalma.com*
Chicago Office
211 W. Wacker Drive, Suite 500
Chicago, Illinois 60606
312.750.1265

**SIPRUT PC**
Joseph J. Siprut
*jsiprut@siprut.com*
17 N. State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000

**GORDON LAW OFFICES, LTD.**
Richard R. Gordon
*richard.gordon@gordonlawchicago.com*
211 West Wacker Drive, Suite 500
Chicago, Illinois 60606
312.236.5200

*Counsel for Plaintiffs and the Putative Class*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................5

ARGUMENT ...........................................................................................................................13

I.  PROPOSED CLASS DEFINITION AND ASCERTAINABILITY ................................13

II.  THIS CASE SATISFIES RULE 23 REQUIREMENTS ..................................................15

    A.  The Rule 23(a) Prerequisites Are Satisfied ...........................................................16

        1.  Numerosity Is Satisfied ................................................................................16

        2.  Commonality Is Satisfied .............................................................................17

        3.  Typicality Is Satisfied ..................................................................................21

        4.  Adequacy Of Representation Is Satisfied ....................................................22

    B.  The Rule 23(b)(3) Requirements Are Satisfied .....................................................23

        1.  Choice of Law ..............................................................................................24

        2.  Uniformity of State Laws .............................................................................25

        3.  Predominance is Satisfied ............................................................................28

    C.  There are No Individualized Damages Issues ........................................................31

    D.  A Class Action Is The Superior Method Of Adjudication .....................................32

CONCLUSION ........................................................................................................................33

# TABLE OF AUTHORITIES

*Acik v. I.C. Sys., Inc.*,
    251 F.R.D. 332 (N.D. Ill. 2008) ........................................................................16

*Allen v. City of Chicago*,
    828 F. Supp. 543 (N.D. Ill. 1993) ...................................................................17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) .............................................................................16, 28

*Anderson v. New Dimension Fin. Servs., L.P.*,
    2001 WL 883700, at *5 (N.D. Ill. Aug. 7, 2001) ............................................27

*Arenson v. Whitehall Convalescent & Nursing Home, Inc.*,
    164 F.R.D. 659 (N.D. Ill. 1996) ......................................................................32

*Barden v. Hurd Millwork Co.*,
    249 F.R.D. 316 (E.D. Wis. 2008) ..............................................................23, 29

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
    280 F.R.D. 408 (N.D. Ill. 2012) ......................................................................15

*Brown v. Pro Football, Inc.*,
    146 F.R.D. 1 (D.D.C. 1992) .............................................................................31

*Butler v. Sears*,
    702 F.3d 359 (7th Cir. 2012) ...........................................................................24

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) .....................................................................16, 27

*Buycks-Roberson v. Citibank Fed. Sav. Bank*,
    162 F.R.D. 322 (N.D. Ill. 1995) ......................................................................27

*Cameron v. E.M. Adams & Co.*,
    547 F.2d 473 (9th Cir. 1976) ...........................................................................26

*Chandler v. Sw. Jeep-Eagle*,
    162 F.R.D. 302 (N.D. Ill. 1995) ......................................................................28

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*,
    No. 14-2843, 2015 WL 4667904 (7th Cir. Aug. 7, 2015) ...............................28

*Christman v. Brauvin Realty Advisors*,
    191 F.R.D. 142 (N.D. Ill. 1999) ......................................................................16

*Day v. Check Brokerage Corp.*,
    240 F.R.D. 414 (N.D. Ill. 2007)...........................................................................16

*De La Fuente v. Stokely-Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) ...........................................................................31

*Fournigault v. Indep. One Mortgage Corp.*,
    234 F.R.D. 641 (N.D. Ill. 2006)....................................................................15, 24

*Garner v. Healy*,
    184 F.R.D. 598 (N.D. Ill. 1999).......................................................................22

*Hinman v. M & M Rental Ctr.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ................................................................22

*IKORoofing Shingle Prods. Liab. Litig.*,
    757 F.3d 599 (7th Cir. 2014) ...........................................................................27

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002)..............................................................................26

*In re Mexico Money Transfer Litigation*,
    267 F.3d 743 (7th Cir. 2001) ...........................................................................25

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ......................................................................24, 27

*King v. Kansas City Southern Indus., Inc.*,
    519 F.2d 20 (7th Cir. 1975) ......................................................................... 15-16

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
    571 F.3d 672 (7th Cir. 2009) ...........................................................................27

*McCrary v. Elations Co., LLC*,
    No. EDCV 13-00242, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) ................................30

*Mejdreck v. The Lockformer Co.*,
    2002 WL 1838141, at *5–6, (N.D. Ill. Aug. 12, 2002)....................................................24

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. July 28, 2015)...........................................................13, 29, 30

*Patterson v. Livaditis*,
    631 F.2d 476 (7th Cir. 1980) ...........................................................................17

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003)............................................................23

*Pella Corp. v. Saltzman*,
    606 F.3d 391 (7th Cir. 2010) ............................................24, 28, 32

*Pope v. Harvard Bancshares, Inc.*,
    240 F.R.D. 383 (N.D. Ill. 2006)................................................... 16-17

*Rohlfing v. Manor Care*,
    172 F.R.D. 330 (N.D. Ill. 1997)....................................................29

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ................................................15, 17

*Sadler v. Midland Credit Mgmt., Inc.*,
    No. 06 C 5045, 2009 WL 901479 (N.D. Ill. Mar. 31, 2009) .................15

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009)....................................................28

*Sebo v. Rubenstein*,
    188 F.R.D. 310 (N.D. Ill. 1999)................................................ 26-27

*Smilow v. Sw. Bell Mobile Sys.*,
    323 F.3d 32 (1st Cir. 2003)..........................................................31

*Smith v. Nike Retail Servs.*,
    234 F.R.D. 648 (N.D. Ill. 2006)....................................................16

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ..................................................27, 30

*Sullivan v. Chase Inv. Servs. of Boston, Inc.*,
    79 F.R.D. 246 (N.D. Cal. 1978).....................................................31

*Sullivan v. DB Investments, Inc.*,
    — F.3d —, 2011 WL 6367740 (3d Cir. 2011) ...............................25

*Tanner v. Jupiter Realty Corp.*,
    433 F.3d 913 (7th Cir. 2006) ................................................. 24-25

*Tylka v. Gerber Prods. Co.*,
    178 F.R.D. 493 (N.D. Ill. 1998)....................................................17

619019.1

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ...........................................................................................16

*Waller v. Hewlett-Packard Co.*,
    295 F.R.D. 472 (S.D. Cal. 2013) ............................................................................22

*Walsh v. Pittsburgh Press Co.*,
    160 F.R.D. 527 (W.D. Pa. 1994) .............................................................................31

*Waste Management Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ...................................................................................26

**Statutes**

815 ILCS 505/10a .............................................................................................................14

Cal. Bus. & Prof. Code § 17208 .......................................................................................14

Mo. Rev. Stat. § 516.120 ...................................................................................................14

N.J.S.A. § 2A:14.1 .............................................................................................................14

NY CLS CPLR 214 ............................................................................................................14

**Other**

Fed. R. Civ. P. 23(a)(1) ......................................................................................................16

Fed. R. Civ. P. 23(a)(2) ..........................................................................................17, 28, 30

Fed. R. Civ. P. 23(a)(4) ......................................................................................................22

Fed. R. Civ. P. 23(b)(2) ......................................................................................................14

Fed. R. Civ. P. 23(b)(3) ..........................................................................................14, 24, 32

619019.1

# INTRODUCTION

Plaintiffs Gary Mednick and Steven Bayer ("Plaintiffs") submit this renewed motion for class certification seeking to certify a single class of persons who bring a single claim grounded in the uniform consumer fraud laws of five states: California, Illinois, Missouri, New Jersey and New York.[1] Plaintiffs' renewed motion is much narrower, both factually and legally, than their prior motion for class certification and, as this Court has already recognized in permitting Plaintiffs to file it, "Plaintiffs' sole claim for relief is now predicated on the allegation that Precor engaged in unfair and misleading representations in marketing its heart rate monitors." Dkt. 145 at 5.

Indeed, Plaintiffs' sole claim is simple: Defendant Precor Inc. ("Precor") falsely advertises the premium Touch Sensor feature of its treadmills, which is supposed to allow users to monitor their heart rate "whether you walk or run" and use Precor-created "SmartRate" programs keyed to heart rate readings. *See* PR_003456-63 (attached hereto as **Exhibit 1**) at PR_003460. Contrary to Precor's representations, the monitoring feature does not work "whether you walk or run." Instead, it starts to exhibit pronounced failure when a user is walking or running at 4.0 mph. At running speeds of 6.0 mph or greater, the feature is wholly unreliable. Plaintiffs' one claim turns on a single question that will resolve the issue for the entire class: Were Precor's statements regarding the accuracy and reliability of the treadmills false and misleading?

The answer to this common question is a resounding yes. The factual record developed in discovery is replete with common proof showing that Precor was well-aware – even before

---

[1] Plaintiffs' First Amended Complaint ("Am. Compl.") seeks certification of a 10-state class. Am. Compl. at ¶99. Plaintiffs now seek certification of a five-state class in response to the Court's directive that the Plaintiffs narrow the number of states. Dkt. No. 145 at 33. However, Plaintiffs expressly reserve this ruling for appellate review, if any.

2008, the year it first began selling the first treadmill implicated in this case – that it was misleading consumers as to capabilities of its heart rate monitoring feature. That common proof includes independent clinical studies found in Precor's *own files*, smoking gun admissions from Precor's top personnel and, incredibly, the testing of an expert retained ***by Precor*** to perform a study of the accuracy of its touch sensor heart rate feature.

*First*, Precor's internal sales documents reveal Precor's pre-sale knowledge and recognition of the importance of its heart rate monitoring feature to consumers. For example, in 2009, Precor ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ *See* PR_017634-35 (attached hereto as **Exhibit 2**) (emphasis added). Precor's dealers directed their salespeople to ████████████████████████████████

████████████████████████████████████████████████████████. *See* PR_017654 (attached hereto as **Exhibit 3**).

*Second*, apart from its own knowledge and recognition in 2009 that it needed to make sure the feature actually worked, clinical studies from 2008 found in Precor's own files confirmed the limitations of hand grip sensors to measure heart rate at higher speeds of exercise. *See, e.g.,* PR_002302-08 (attached hereto as **Exhibit 4**) ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ ; PR_16740-63 (attached hereto as **Exhibit 5**) ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████.

     *Third*, Precor's internal documents confirm that, as early as 2008 (again, the year it started selling the first treadmill at issue here), ████████████████████████████████ ████████████████████████████.  In fact, in 2008 alone, Precor ████████████████ ████████████████████████████████████████.  *See* Exhibit 2.  When Precor analyzed possible solutions to this rampant problem, the alternatives were ████████████ ████████████████████████████████████ *Id*.

     *Fourth*, the evidence shows that, despite having been on notice of the problem since at least 2008, Precor continued to ignore the problem (and continues to do so to this day). In 2010,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████  *See* PR_017507 (attached hereto as **Exhibit 6**) (emphasis added).  Yet, even after this, Precor did nothing and has still not done anything, even though ██ ██████████████████████████████  *See* PR_004412 (attached hereto as **Exhibit 7**) (████████ ██████████████████████████████████████████s).

     *Fifth*, as this Court already found, Precor engaged in a common, standardized marketing campaign concerning the Touch Sensor heart rate monitoring feature.  Dkt. No. 125 at 2. The consistent course of misrepresentations includes statements by Precor that its monitoring feature allows the user to "maximize [his or her] workouts, "instantly" analyze heart rate, and "stay in

[his or her] fat burn, cardio, or peak target zone for a more efficient cardio and weight loss workout," "whether you walk or run." *See* Exhibit 1; *see also* Product Brochures for Precor's new "TRM" treadmill series (attached hereto as **Exhibit 8**). None of the evidence Plaintiffs have adduced makes any distinction in the monitoring feature as to specific machines, platforms, model or year of manufacture.

*Sixth*, Precor's own expert's testing confirms that the monitoring feature does not work consistently at higher speeds of exercise. Specifically, Michael Garrett's study reveals that ███

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████ *Id.*

In support of this renewed motion for class certification, Plaintiffs have submitted a revised report from their expert, Dr. Craig Henriquez, PhD, a Professor of Biomedical Engineering at Duke University. In his revised report, Dr. Henriquez discusses the results of Mr. Garret's study in detail, demonstrating that Garrett's data actual *supports* Plaintiffs' theory of the case. *See generally* **Exhibit 9** (Henriquez Amended Report). Indeed, as this Court has already recognized:

> While the two sides' experts necessarily quibble with each other's bottom lines, they are in remarkable agreement on one point: the performance of the treadmills' heart rate monitors deteriorated sharply as the users get up to high running speeds.

Dkt. 145 at 19.

*Seventh*, damages in this case stemming from Precor's misrepresentations can be mathematically computed on a class-wide basis. Plaintiffs' previously-proffered damages expert, Jonathan E. Schwartz, a Chartered Financial Analyst and applied economist, explains that there

-4-

are feasible economic methodologies that can be used to reliably estimate the portion of the price paid each consumer paid for Precor's the Touch Sensor feature, including cost-based and demand-based price comparisons and hedonic price regression. Plaintiffs re-submit Mr. Schwartz's report for the Court's Convenience, attached hereto as **Exhibit 10**.

All of this demonstrates that there are common, predominant questions of fact and law in this case that are equally applicable to every Class member, susceptible to class-wide proof and show the superiority of a class action. For these reasons and those below, Plaintiffs respectfully request that the Court: (1) certify this matter as a class action; (2) designate Plaintiffs as Class Representatives; and (3) appoint their counsel, Lite DePalma Greenberg, LLC, Siprut PC, and Gordon Law Offices, Ltd., as Class Counsel.

## FACTUAL BACKGROUND

### *Precor's False and Misleading Marketing of its Touch Sensor Monitoring Feature*

Plaintiffs' claim in this case is based on uniform misrepresentations made in uniform advertisements distributed to residents of states with uniform consumer fraud laws.

Precor manufactures, markets, sells, and distributes state-of-the-art "premium fitness equipment." Def. Ans. ¶1, No. 14-cv-4231 Dkt. No. 20. According to Precor, one of the salient features of its premium machines is Touch Sensor heart rate monitoring, which allows the user to grip a sensor while exercising in order to receive a heart rate reading. *See* Deposition of Tormay Brown (attached hereto as **Exhibit 11**) at 22:5-15. This feature accompanies *all* treadmills in Precor's Home Treadmill product line, as defined in Plaintiffs' Class Definition below, except for two (the 9.21 and 9.31 treadmill models, which are necessarily excluded from the Class because they do not have the Touch Sensor Feature). ***All of the Home Treadmill models***

*included in the Class Definition incorporate the exact same design*.  *See* Deposition of Doug Johns (attached hereto as **Exhibit 12**) at 15:25-16:3, 51:17-22.[2]

Precor's marketing campaign for all of these treadmills is extensive, widespread, comprehensive and uniform.  Nothing in discovery revealed that Precor made any effort to create different marketing for any particular treadmill model.  Nothing in discovery revealed that Precor made any effort to create any state-specific marketing for the treadmills sold in different states.

For all of its treadmills, Precor's product brochures highlight the Touch Sensor heart rate feature.  *See, e.g.*, Exhibit 1 (Precor 9.23, 9.27, 9.33, and 9.35 treadmills) (inviting consumer to "[m]aximize your workout results **whether you walk or run** with touch and telemetry heart rate monitoring.") (emphasis added); *see also* Exhibit 8 (TRM 211, 223, 243, 425, and 445 treadmills) (inviting consumer to "maximize your workout results with touch sensor heart rate monitoring," noting that the SmartRate feature "helps you stay in your fat burn, cardio, or peak target zone for a more efficient cardio and weight loss workout").  These product brochures, created by Precor, are sent directly to third-party retail stores for the purpose of: (1) training sales personnel to learn about product features; (2) preparing sales representatives to speak with and sell Precor fitness equipment to consumers; and (3) providing point-of-sale marketing materials to give to potential purchasers "███████████████████████████████████ ████████████████████████████████."  *See* Exhibit 12 at 7:16-8:23.[3]  These standardized brochures demonstrate that the Touch Sensor feature is uniformly marketed at the point of sale.

---

[2] Mr. Johns's testimony debunks the Precor myth that there are material differences in the internal components of Precor's machines and that such differences make the products so different that a class encompassing all of these machines cannot be certified.

[3] Mr. Johns, Precor's Vice President of Global Market and Strategy, confirmed that ███████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████

Likewise, Precor's website repeats the same standard representations concerning the Touch Sensor monitoring feature for all of its treadmills. For example, Precor **to this day** advertises that the Touch Sensor feature will "instantly analyze your heart rate when you enter your age and weight," and that SmartRate "helps you stay in your fat burn, cardio or peak target zone for a more efficient cardio and weight-loss workout." *See* http://www.precor.com/en-us/heart-rate-monitoring (last visited October 26, 2016). Precor's website also displays a link to product brochures containing the same or similar representations referenced above. *See, e.g.*, PR_003385-97 (attached hereto as **Exhibit 13**) at PR_003392 (9.27 Treadmill: "Advanced heart rate monitoring ensures you stay in your target zone . . ."). Aware that users rely on this special feature for medical reasons, Precor advises users to keep their "physician-recommended target heart rate zone" in mind when utilizing the heart rate monitoring features. *See* PR_00001-59 (attached hereto as **Exhibit 14**) at PR_00015.

Precor also makes representations regarding its Touch Sensor heart rate features on the machines themselves. All of Precor's treadmills prominently display: (1) a picture of a heart where a user can view his or her heart rate;[4] and (2) the word "SmartRate,"[5] the feature that



.................." Exhibit 12 at 7:16-24.

[4] *See* Deposition of Johana Duque (attached hereto as **Exhibit 15**), at 28:12-17. "

".

[5] "

Exhibit 12 at 15:25-16:12.

allows users to use programs stay within target heart rate zones to maximize workouts.[6]  As the following representative screen shot of Precor's 9.23 treadmill shows, the very first gauge above the upper left hand corner of the lit screen is the "HEART RATE" reading, below it is a picture of a heart, and the word "SmartRate" to the left of the display appears to enable the user to understand their target heart rate zone:



*See* Am. Compl. at ¶12.

And, while the look has changed for Precor's newest "TRM" series of treadmills, the heart rate monitoring capabilities of the machines are represented in precisely the same way (just to the left of the lit screen is the word "SmartRate" and underneath it are heart rate zones and just above the lit screen (in the left corner), is the gauge that is supposed to provide the user the "HEART RATE" reading):

---

[6] "A."  *Id.* at 18:25-19:2.



These representations are uniform across the class, as discovery has not indicated that Precor omits this advertising from any of its treadmills.

### Plaintiffs' Experiences

Both Plaintiffs in this case were instructed on the Touch Sensor feature prior to their respective purchases. Plaintiff Steven Bayer testified that while shopping at Chicago Home Fitness, he walked on the Precor 9.23 treadmill, put his hands on the Touch Sensors, and noticed the SmartRate feature on the display console. *See* Deposition of Steven Bayer (attached hereto as **Exhibit 17**) at 24:2-10 ("[w]hen I saw the Precor 9.23… I was able to step on the device, I was able to put my hands on the heart rate monitor… I was able to see on the display it had the time, it had the smart heart and the heart rate number display").

Similarly, Mr. Mednick was exposed to Precor's Touch Sensor heart rate monitoring representations prior to purchasing a Precor treadmill. Am. Compl. at ¶75. Because he had recently suffered a heart attack, Mednick was interested in exercise equipment that provided

heart rate monitoring and relied on Precor's representations regarding the Touch Sensor heart rate monitoring system in deciding to purchase a Precor machine. *See* Deposition of Gary Mednick (attached hereto as **Exhibit 18**) at 71:11-14 (while shopping at the Great Escape, "the salesman showed me [the Precor 9.23 treadmill] had Touch Sensors on it – sensor – because I told him I had just been in cardio rehab, and I had to watch my [heart rate]").

As will be shown below, Plaintiffs' consumer fraud claims do not require a showing of reliance. However, both Mr. Bayer's and Mr. Mednick's experiences exemplify how the representations regarding the Touch Sensor heart rate monitoring message are material and objectively misleading. Precor consistently touts the Touch Sensor feature by prominently displaying it at the point-of-purchase, whether through sales personnel feeding information supplied by Precor, in product brochures created by Precor, on Precor's website, or on the actual exercise equipment itself. All of these statements reflect Precor's uniform representation that its Touch Sensors actually work. But, in reality, the monitoring feature is unreliable and incapable of providing accurate heart rate information (further explained below).

### *Precor's Knowledge and Recognition of the Misrepresentations: Admissions by its Top Personnel*

Discovery also confirms that there is no question that Precor was aware that it was making misrepresentations regarding the accuracy and reliability of the Touch Sensors. In fact, ***Precor had in its own files copies of studies revealing the unreliability of the Touch Sensors***. *See* Exhibits 4 and 5. Precor also ███████████████████████████████████████████████ ████████████████████████████. Further, Precor created a document titled "████████████████," wherein it documented ████████████████████████████████████████████ ████████████. *See* Exhibit 2; *see also* Exhibit 7 (████████████████████████████████ ████████████████████████████████████████).

-10-

The "⬛⬛⬛⬛⬛⬛⬛⬛⬛" document confirms that Precor recognized that the Touch Sensors were inaccurate and unreliable and ignored it, putting its own interest in cost-cutting above the truth and the needs of its customers. The document shows that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. *See* Exhibit 2. Admitting that "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛"). *Id.* Precor's suggested solutions to these issues "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" and, as of the date the document was created, "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛." *Id.* In other words, Precor was aware of the problems but chose not to do anything about them.

Moreover, in 2010 (years before Plaintiffs purchased their machines), Precor's ⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. *See* Exhibit 6. Precor thus knew well before Plaintiffs (or any Class member) ever purchased a Precor treadmill that it was making misrepresentations about the Touch Sensor feature's accuracy and reliability.

***The Parties' Expert Reports***

Plaintiffs' liability expert is Dr. Craig Henriquez, Ph.D, a Professor of Biomedical Engineering at Duke University with decades of experience in the field of bioelectricity (and specifically in cardiac electrophysiology, which is the science relating to the electrical activities

---

[7] As shown below, the class period correlates to the statute of limitations of each state's consumer protection law.

of the heart).  His full curriculum vitae, as well as his amended expert report, are attached hereto

as Exhibit 9.

Dr. Henriquez's amended report is limited and concerns only theories that were *not*

excluded by the Court and upon which the Court found Dr. Henriquez qualified to opine.[8]  The

revised report does not rely on or contain any reference to his own testing, and specifically omits

any opinion premised on that testing (which was excluded by the Court).  Dr. Henriquez has now

limited his report to discussing only scientific information on motion artifact and an analysis of

Precor's own expert's testing to support his opinion.[9]  Dr. Henriquez, who is eminently qualified,

will thus assist the jury in understanding motion artifact theory, the relevant literature, what

Precor itself knew about the misrepresentations it was making about its Touch Sensors, and that

---

[8] For example, the Court recognized that Dr. Henriquez is qualified to opine on motion artifact.
*See* Dkt. No. 125 at 9. ("Henriquez's qualifications are not at issue here . . . ."). Though the Court
excluded Henriquez's *opinion* as based on improper testing, it accepted his *theory*:

> Precor appears to confuse Henriquez's *opinion* — that exercise equipment
> like the tested Precor products, which rely on metal handgrip sensors,
> provide inherently unreliable heart rate data — with his *theory* — that
> motion artifact can disrupt the measurement of the electrical currents
> produced by the human body and result in a miscalculated heart rate. . . .
> [Henriquez's] *theory* has been the subject of numerous research papers and
> studies — many of which both parties' experts review and rely upon in
> forming their opinions in this litigation.

*Id.* at 10.

[9] While Dr. Henriquez has excluded any reference to and does not at all rely on the prior testing
he conducted, that testing was consistent with Mr. Garrett's test results.  *See* Dkt. No. 87-1,
Exhibit 3.  As part of his investigation, Dr. Henriquez previously performed limited testing of
one subject on three treadmills, collecting heart rate data while the subject was walking and
running on the treadmill at varying speeds and comparing it to an electrocardiogram signal
recorded directly from chest electrodes or through a Polar H7 chest strap and an iPhone mobile
application.  *Id.* at 13.  Though this testing was excluded by the Court, the results were consistent
with those of Precor's expert's testing: as speed increased, the Touch Sensors did not depict
accurate heart rate measurements.  *Id.* at 16.

Precor's expert testing confirms that the monitoring feature could not work at higher speeds of exercise.

As Dr. Henriquez explains in his revised report, heart rate monitoring dependent on metal hand grip sensors cannot deliver reliable results because body movement while exercising (known as "motion artifacts") affects the ability of touch sensors to interpret and record heart rate signals. Motion artifacts, *i.e.* the motion of limbs, torso, and digits, create noise that disrupts the measurement of the electrical activity through the palms, resulting in a miscalculated heart rate. *Id.* at 1. Dr. Henriquez analyzed the well-known literature and studies concerning touch sensor heart rate monitoring technology. *Id.* at 5-7. These authorities suggest that touch heart rate sensors have limited capabilities because of the impact of motion artifact on heart rate readings.

Dr. Henriquez also analyzed Precor's own expert's testing of numerous subjects exercising on Precor's treadmills, concluding that Garrett's testing was consistent with the testing performed in the clinical studies that were in Precor's possession: hand grip sensors are ███████████████████████████████████████████. *Id.* at 7-14.

## ARGUMENT

## I.    PROPOSED CLASS DEFINITION AND ASCERTAINABILITY.

"[C]ourts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind. In addressing this requirement, courts have sometimes used the term 'ascertainability.'" *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657, (7th Cir. July 28, 2015). "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* at

660. The Seventh Circuit recently rejected the heightened ascertainability requirement promulgated by other courts, finding that it "goes much further than the established meaning of ascertainability and in our view misreads Rule 23." *Id*. at 662.

Plaintiffs seek class certification under Fed. R. Civ. P. 23(b)(3)[10] for violations of Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and the laws of four other states that are materially similar to the ICFA as follows:

> All persons who purchased, within the time period outlined below,[11] a Precor Home Treadmill[12] equipped with a touch sensor heart rate monitor from either Precor or a third-party retailer and who are residents of California, Illinois, Missouri, New Jersey and New York. Excluded from the Class are defendant herein, and any person, firm, trust, corporation, or other entity related to or affiliated with defendant, including, without limitation, persons who are directors of Precor. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

| State | Class Period[13] |
|---|---|
| California | May 16, 2010 - present |
| Illinois | May 16, 2011 - present |
| Missouri | May 16, 2009 - present |
| New Jersey | May 16, 2008 - present |
| New York | May 16, 2011 - present |

---

[10] In light of the Court's prior denial of Fed.R.Civ.P. 23(b)(2) certification, Dkt. 125, at 22-23, Plaintiffs do not seek to certify an injunctive class but expressly preserve this issue for future appeal, if any.

[11] A table containing a class period that corresponds to the statute of limitations of individual state laws is routinely part of class definitions in Class Notices. *See* **Exhibit 19**).

[12] As of the date of this filing, Precor Home Treadmills equipped with a touch sensor heart rate monitor are identified on Precor's website, http://www.precor.com/en-us/customer-service/owners-manuals. They include the following models: 9.23, 9.27, 9.33, 9.35, TRM 211, TRM 223, TRM 243, TRM 425 and TRM 445.

[13] These class periods correlate to the statute of limitations of each respective state's consumer fraud law (Cal Bus & Prof Code § 17208 (4 years); 815 ILCS 505/10a (3 years); § 516.120 R.S.Mo. (5 years); N.J.S.A. § 2A:14.1 (6 years); NY CLS CPLR § 214) (3 years)).

-14-

In the alternative, Plaintiffs seek to certify a class of Illinois residents as follows:

> All persons who purchased, from May 16, 2011 to the present, a Precor Home Treadmill[14] equipped with a touch sensor heart rate monitor from either Precor or a third-party retailer and who are residents of Illinois. Excluded from the Class are defendant herein, and any person, firm, trust, corporation, or other entity related to or affiliated with defendant, including, without limitation, persons who are directors of Precor. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

Here, the proposed Class is ascertainable because the definition is precise and class membership can be determined by entirely objective means: if a consumer purchased a Precor Home Treadmill equipped with Touch Sensors during the relevant class period, he or she is a member of the class. *See Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) ("It is enough that the class be *ascertainable*."); *Sadler v. Midland Credit Mgmt., Inc.*, No. 06 C 5045, 2009 WL 901479, at *2 (N.D. Ill. Mar. 31, 2009) ("An identifiable class must be ascertainable through 'objective criteria[.]'").

## II.     THIS CASE SATISFIES RULE 23 REQUIREMENTS.

To obtain class certification, putative class representatives must demonstrate all four prerequisites for certification under Rule 23(a) and at least one basis for certification under Rule 23(b). *See, e.g., Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992); *Fournigault v. Indep. One Mortgage Corp.*, 234 F.R.D. 641, 644 (N.D. Ill. 2006). In accordance with Rule 23(a), the prerequisites for certification are numerosity, commonality, typicality, and adequacy.

The Seventh Circuit recognizes that "Rule 23 must be interpreted liberally. Its policy is to favor maintenance of class actions." *King v. Kansas City Southern Indus., Inc.*, 519 F.2d 20,

---

[14] As of the date of this filing, Precor Home Treadmills equipped with a touch sensor heart rate monitor are identified on Precor's website, http://www.precor.com/en-us/customer-service/owners-manuals. They include the following models: 9.23, 9.27, 9.33, 9.35, TRM 211, TRM 223, TRM 243, TRM 425 and TRM 445.

25-26 (7th Cir. 1975). When determining whether class certification is appropriate, courts conduct sufficient inquiry to resolve questions of law and fact relevant to certification, but they should not undertake an extensive analysis of the merits.  *See Acik v. I.C. Sys., Inc.*, 251 F.R.D. 332, 334 (N.D. Ill. 2008). Merits may only be considered to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).  "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Doubts regarding whether to grant class certification generally should be resolved in favor of certification. *See, e.g., Day v. Check Brokerage Corp.*, 240 F.R.D. 414, 417 (N.D. Ill. 2007); *Christman v. Brauvin Realty Advisors*, 191 F.R.D. 142, 154 (N.D. Ill. 1999).

As shown below, this case is uniquely suited for certification because, as this Court already recognized "Plaintiffs' sole claim for relief is now predicated on the allegation that Precor engaged in unfair and misleading representations in marketing its heart rate monitors." Dkt. 145 at 5.

A.     **The Rule 23(a) Prerequisites Are Satisfied.**

1.     **Numerosity Is Satisfied.**

Numerosity is satisfied where "the class is so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, no specific number is required, nor is a plaintiff required to state the exact number of potential class members. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006).  Generally, where the membership of the proposed class is at least 40, joinder is impracticable and numerosity is met. *Pope v.*

*Harvard Banchares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006). Numerosity is satisfied here because Precor markets and sells *thousands* of treadmills to consumers in California, Illinois, Missouri, New Jersey and New York on an annual basis.[15] Considering the amount of putative class members, joinder would be impracticable and unmanageable.

### 2. Commonality Is Satisfied.

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Courts recognize that there may be factual differences between class members, but "factual variations among class members' claims" do not themselves "defeat the certification of a class." *Patterson v. Livaditis*, 631 F.2d 476, 481 (7th Cir. 1980), *cert. denied*, 451 U.S. 914 (1980). "If 'at least one question of law or fact [is] common to the class,' then commonality is typically found." *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 496 (N.D. Ill. 1998) (quoting *Allen v. City of Chicago*, 828 F. Supp. 543, 551 (N.D. Ill. 1993)). "A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Here, Plaintiffs' sole consumer fraud claim arises from Precor's false advertising of its treadmills. The claim raises questions of law and fact that are common to all Class members, including without limitation:

(a) Whether Precor's representations, omissions and conduct regarding the marketing and sale of its treadmills were unfair, misleading or false;

(b) Whether Precor engaged in deception in its marketing and sale of its treadmills;

(c) Whether Precor's representations, omissions and conduct regarding

---

[15] *See* Exhibit 11 at 10:25-11:17 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").

treadmills were likely to deceive a reasonable consumer;

    (d)      Whether a reasonable person would have considered Precor's misrepresentations material;

    (e)      Whether Plaintiffs and members of the Classes were deceived by Defendant's representations, omissions and conduct;

    (f)      Whether Precor violated state consumer fraud laws;

    (g)      Whether the members of the Classes have been injured by Precor's conduct; and

    (h)      Whether the members of the Classes have sustained damages and are entitled to restitution as a result of Precor's wrongdoing and, if so, what is the proper measure and appropriate formula to be applied in determining such damages and restitution.

These questions are undoubtedly common. Without class certification, individual plaintiffs could be forced to re-litigate these questions in every single case, a totally inefficient result given that these issues are capable of resolution via common proof, as set forth at length in the Statement of Facts herein and summarized below.

This Court already recognized that this case presents common questions related to false advertising. Specifically, the Court found that Precor's "*nationwide* marketing campaign *uniformly* advertises the benefits of its Touch Sensors across its various fitness machines" and that "for *all* of its product lines, Precor's product brochures highlight the Touch Sensors." Dkt. No. 125 at 2. The same holds now that Plaintiffs' claims are limited to Precor's treadmills. As detailed above, through Precor's brochures, owner's manuals, statements on Precor's website, statements made by Precor's dealers, and even on the actual exercise equipment itself, Precor consistently represents to consumers that the Touch Sensors on all of its treadmills are capable of providing a reliable heart rate measurement. Indeed, *every single one* of the products at issue has a HEART RATE gauge, a heart icon – and accompanying SmartRate feature concerning target

heart rate zones – displayed right on the console of the machine itself. Precor's statements about the Touch Sensors were uniform across the Class and present common questions capable of class-wide proof. Precor's marketing to consumers undoubtedly presents common questions of fact.

Precor's knowledge and recognition of the problem and its concerted failure to act also present common questions of fact. As set forth in the Statement of Facts herein, Precor's own records and internal reports and independent clinical studies (contained in its own files) demonstrate that Precor ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████." To this day, Precor still aggressively markets the Touch Sensor feature to consumers despite all of this evidence. Plaintiffs can prove Precor's knowledge and concerted failure to act through common proof on a class-wide basis.[16]

Further, as is also discussed in the Statement of Facts above, Precor's post-litigation testing conducted by its expert, Michael Garrett, confirms that heart rate monitoring does not work at high speeds. Garrett's study reveals that ████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████. Dkt. No. 98-2 at 50. *The same testing showed that* ██████████████

_____

[16] *See, e.g.,* Exhibit 4 at PR_002304 (██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████;" Exhibit 2 (████████████████████████████████████████

████████████████████████████████");  Exhibit 6 (████████████████████████████████████

████████████████████); Exhibit 7 (████████████████████████████████████████████████

████████████████████████████████████████████████████████████).

-19-

[BLACK REDACTION BAR]

**.** *Id.* As Dr. Henriquez explains, "[t]his finding of [BLACK REDACTION] [BLACK REDACTION] is consistent with the prior literature" and "is likely due to uncompensated motion artifact generated at the hand-electrode interface." Exhibit 9 at 13. This was precisely what one clinical study in Precor's possession also found:

> **[Lee and Mendoza] noted that the percent of measurements successfully obtained from the sensors tended to decrease (84 and 65.6%, respectively) when running speeds went from 4.5 miles/hr to 6 miles/hr. They also found that the limits of agreements between the monitor estimate and ECG increased (worsened) at 6 miles/hr.** The authors noted that "since jogging and running result in significant upper body movement, there is a possibility that there will be instances in which heart rate will not be obtained via the handgrip sensors. The errors are potentially a result of increased motion artifact affecting the clarity of the recorded electrical signal that in turn hampers processing and/or intermittent loss of electrical conductivity palm of the hand and the sensors."

*Id.* at 7. Thus, whether Touch Sensor heart rate monitoring can provide accurate results during exercise presents even more common questions that can be resolved with common proof.

Even further, and though Plaintiffs are not required to make any showing of class-wide damages as a prerequisite to class certification, Plaintiffs have done so here. Plaintiffs' economic expert, Jonathan Schwartz of Nathan Associates, Inc., demonstrates that damages can also be calculated on a class-wide basis. *See* Exhibit 10. As Mr. Schwartz describes in his report, "there are feasible economic methodologies that can be used to reliably estimate the portion of the price paid by consumers of Precor's exercise equipment for the touch sensor feature." *Id.* at ¶ 5.

Specifically, the price of Precor exercise equipment but for the inclusion of the Touch Sensor feature can be determined by comparing the prices of Precor products with the feature

and prices of Precor products without the feature using either a cost-based or demand-based approach. *Id*. at ¶ 13. Under a cost-based approach, Precor products that incorporate the Touch Sensors are compared with the most similar Precor products without them (for example, the 9.33 treadmill, which has the Touch Sensor feature, and the 9.31 treadmill, which does not). *Id*. at ¶¶ 13-14. The portion of the total bill of materials cost difference attributable to the Touch Sensor feature is then multiplied by the difference in retail price between the models to determine the retail price difference attributable to the feature. *Id*. at ¶ 16. This method yields a price difference attributable to the Touch Sensor feature of between $165 and $183. *Id*. at ¶ 17. The demand-based approach takes a similar but slightly different tack, utilizing surveys whereby consumers are presented with products with different attributes and asked to select the product that they are most likely to purchase. A multiple regression analysis can then be performed using the data on consumers' ranks or ratings and product features, with the output used to determine consumers' willingness to pay for each of the features in question, including the Touch Sensors. *Id*. at ¶ 18.

In the alternative, Mr. Schwartz proposes a "hedonic price regression" method whereby the value of the Touch Sensor feature is estimated by controlling for other features of value such as brand name, deck size, speed, incline range, horsepower, and other relevant characteristics of cardiovascular exercise equipment. *Id*. at ¶ 20. Regardless of which methodology is used, Mr. Schwartz's report shows that damages can be determined using a common analysis and common proof.

### 3. Typicality Is Satisfied.

Pursuant to Rule 23(a)(3), a class action requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Where class members

and class representatives purchase the same defective products, and they advance the same legal theories regarding those products, the typicality requirement is satisfied. *See Pella Corp.*, 257 F.R.D. at 479 (finding typicality where class members and class representatives advanced fraud theories arising out of defective windows). Here, Plaintiffs and the proposed Classes assert the same claim under the same legal theory arising from the same course of conduct: Precor's deceptive and uniform representations regarding the Touch Sensor monitoring feature. And Plaintiffs, like every Class member, were injured at the point-of-sale when they failed to receive the benefit of the bargain. *See Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 484 (S.D. Cal. 2013) ("Plaintiffs bought and now own a device that just doesn't do what it's alleged to do, and is therefore of diminished utility and value."); *Garner*, 184 F.R.D. at 604 (finding typicality satisfied where the plaintiffs, like the class, purchased one or more of the defendant's non-wax products and "believed that they were getting something more than they ultimately received").

There are no material distinctions that set Plaintiffs apart from the Class members. Plaintiffs' claims are legally and factually consistent with those sought on behalf of the proposed Classes. As a result, the Class representatives' theories are typical of the Class members' anticipated claims.

### 4. Adequacy Of Representation Is Satisfied.

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where the class representative "(1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class." *Pella I*, 257 F.R.D. at 480; *Hinman*, 545 F. Supp. 2d at 807.

619019.1

With regard to the first requirement, Plaintiffs' counsel provide considerable expertise prosecuting class actions, including those involving consumer fraud, and are well-qualified to represent the Class. This Court already has considered the Rule 23(g) factors in appointing Katrina Carroll (Lite DePalma Greenberg, LLC) and Joseph J. Siprut (Siprut PC) as interim Co-Lead Counsel in the Consolidated Action, and Richard Gordon (Gordon Law Offices) to Plaintiffs' Executive Committee. *See* Dkt. No. 35 (appointing interim class counsel). Counsel respectfully request that, in addition to the reasons underlying the Court's decision to appoint these firms as interim class counsel, the firms' diligent efforts in this litigation to date justify their appointment as class counsel.

For the latter two requirements, if there are no substantial factual differences between the class and the representatives, then the representatives may be expected to vigorously advocate for the class. And in such circumstances, there is no meaningful danger of a conflict of interest. *See, e.g., Barden*, 249 F.R.D. at 318 (holding that representatives adequately represented interests of class in products liability case); *Payne v. Goodyear Tire & Rubber Co.,* 216 F.R.D. 21, 26 (D. Mass. 2003) (same). Here, there are no significant factual differences between the claims of the Class members and Plaintiffs. Thus, vigorous representation may be expected, without any potential conflict of interest. Considering all relevant circumstances, the adequacy prerequisite is satisfied as well.[17]

### B. The Rule 23(b)(3) Requirements Are Satisfied.

Under Rule 23(b)(3), certification is appropriate if: (i) common questions of law *or* fact predominate over questions affecting the individual class members only; and (ii) class treatment is superior to other methods available for adjudicating the controversy. The objective behind

---

[17] Rule 23(g)(1) also requires the Court to appoint Class Counsel. Plaintiffs request the Court appoint Siprut PC, Lite DePalma Greenberg, LLC, and Gordon Law Offices, Ltd.

619019.1

these two requirements is to promote economy and efficiency in actions that primarily involve monetary damages. Fed. R. Civ. Pro. 23(b)(3) Advisory Committee Notes; *see Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (*Butler I*) (7th Cir. 2012) ("Predominance is a question of efficiency.") (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16, (1997)). "Considerable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Fournigault v. Independence One Mortg. Corp.,* 234 F.R.D. 641, 646 (N.D. Ill. 2006) as amended on reconsideration in part, 2007 WL 1423866 (N.D. Ill. May 10, 2007) (citing *Mejdreck v. The Lockformer Co.,* 2002 WL 1838141, at *5–6, (N.D. Ill. Aug. 12, 2002)).

The issue of predominance is qualitative, not quantitative. If there is one common overriding material issue which goes to the heart of all class members' claims that will, if resolved either in favor of the Class or the Defendant, substantially resolve all claims, then predominance is satisfied. *Pella Corp.*, 606 F.3d at 394; *Whirlpool*, 722 F.3d at 858-59.

In the Statement of Facts and commonality sections *supra*, Plaintiffs have demonstrated the significant factual overlap in common questions, all susceptible to class-wide proof. These common factual issues all similarly support a finding of predominance. Putting aside all the common factual issues, there are also common legal issues among the claims here.

### 1.    Choice of Law

Any discussion of predominance necessarily implicates choice of law issues. When exercising diversity jurisdiction, a federal court applies the choice-of-law principles of the forum state. Under Illinois law, the governing law for a claim is supplied by the state that has the most "significant relationship" with the claim. *See, e.g., Tanner v. Jupiter Realty Corp*., 433 F.3d 913,

915-16 (7th Cir. 2006). Here, both Plaintiffs are Illinois residents, and Illinois law governs their claims. With respect to the Classes Plaintiffs seek to represent, Plaintiffs believes this Court should certify a five-state Consumer Fraud Class (with possible subclasses, to the extent the Court deems subclassing appropriate).

Variations in state law do not preclude certification of a class with members from different states. Where states provide materially similar legal standards for a claim, those claims may be included within a single class. *See, e.g., In re Mexico Money Transfer Litigation*, 267 F.3d 743, 747 (7th Cir. 2001); *see also Sullivan v. DB Investments, Inc.*, — F.3d —, 2011 WL 6367740 at *14-*15 (3d Cir. 2011) (en banc).

For the purposes of determining Precor's liability, the states' laws of consumer fraud are largely uniform, as shown below. As such, common questions predominate over any individual questions on the legal question of liability. Should this Court deem it necessary, any significant differences can be resolved through certification of certain state subclasses, thereby respecting state law differences while maintaining the overall economy of class action proceedings.

### 2.    Uniformity of State Laws

Plaintiffs seek to certify a five-state consumer fraud class under Illinois law and the law of the following states: California, Illinois, Missouri, New Jersey and New York. While these actual statutes are not verbatim identical, they share many common characteristics, and all of them make deceptive trade practices unlawful and afford liberal remedies to consumers. For ease of reference, Plaintiffs attach as **Exhibit 20** hereto a chart outlining the uniform laws of each state. As shown, all implicated consumer fraud laws allow for a private right of action and actual damages. *Id.* None of the states' laws require a showing of reliance, and scienter or wrongful intent is either not required or satisfied where the misrepresentation is objectively

material (a common question). *Id.* Even with respect to causation, all states set the bar low. Under the laws of the implicated states, causation is satisfied where the misrepresentation is materially misleading to a reasonable consumer or as long as the misrepresentation precedes the purchase. *Id.*

The only differences in the states' laws are statute of limitations and damages-related issues. *Id.* Courts routinely grant class certification despite differences in statutes of limitations. "Due to the predominance of other issues, differences in applicable statutes of limitations do not bar class certification under Rule 23(b)(3)." *Pella I*, 257 F.R.D. at 486; *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)."); *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) ("The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones. Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases"); *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("[T]he mere fact that [statute of limitations] concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)"). Accordingly, it should come as no surprise that several courts in this Circuit have rejected arguments that differences in statutes of limitations defeat class certification. *See Sebo v.*

*Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999); *Anderson v. New Dimension Fin. Servs., L.P.*, 2001 WL 883700, at *5 (N.D. Ill. Aug. 7, 2001), *report and recommendation adopted*, 2001 WL 1155251 (N.D. Ill. Sept. 28, 2001); *Pella I*, 257 F.R.D. at 486; *Sparano*, 1996 WL 681273, at *4. Differing statutes of limitation is simply not a basis for denying class certification.

The sole remaining difference between the states' laws relate to the types of damages to which class members are entitled. However, these differences do not defeat class certification:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.

*Butler*, 727 F.3d at 801. *See also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *IKO Roofing,* 757 F.3d at 603 (rejecting the "mistaken belief that 'commonality of damages' is legally indispensable" for class certification); *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 757 (7th Cir .2014); *Whirlpool,* 722 F.3d at 857. Thus, the proposed class can easily be parsed into damages subclasses if necessary. *See, e.g.*, *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 338 (N.D. Ill. 1995) (noting that "Rule 23(c)(4) empowers the Court to divide the class into subclasses" as appropriate).

As a result of the uniformity of these laws, a common analysis can be used to determine liability under these states' consumer fraud statutes, and this liability question predominates over any individual issues arising in the consumer fraud context. The Court should certify the five-

state consumer fraud class.[18]

### 3. Predominance is Satisfied.

"Considerable overlap exists between Rule 23(a)(2)'s commonality prerequisite and 23(b)(3). Rule 23(a)(2) requires that common questions exist; Rule 23(b)(3) requires that they predominate." *Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D. 302, 309 (N.D. Ill. 1995). "Common issues of fact and law predominate in particular when adjudication of questions of liability common to the class will achieve economies of time and expense." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, No. 14-2843, 2015 WL 4667904, at *14 (7th Cir. Aug. 7, 2015). "'Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions predominate over any questions affecting only individual class members.'" *Id*. (quoting *Amgen Inc. v. Conn. Retirement Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013)).

As shown in the attached state-law chart, *see* Exhibit 20, none of the implicated states' laws require an analysis of individual issues like reliance, and common questions such as whether the misrepresentations are objectively misleading or material will be resolved with common answers. Thus, the law in the Seventh Circuit supports certification here because where a case is limited to whether representations are misleading, the plaintiffs' claims "rise or fall on whether [defendant's] representations were deceptive," and thus, individual factors like each person's physiology, cannot defeat predominance because advertising claims do not hinge on

---

[18] Assuming strictly for the sake of argument that the five states' consumer fraud laws cannot be reconciled with one another, that is not an automatic bar to certification. *See Saltzman v. Pella Corp.* ("*Pella I*"), 257 F.R.D. 471, 484 (N.D. Ill. 2009) *aff'd*, 606 F.3d 391 (7th Cir. 2010) (finding commonality and predominance despite presence of state law differences in definition of injury; reliance, causation, and scienter requirements; and reasonable consumer standards).

proof of a defect. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015); *see also*

Dkt. No. 145 at 19-20 ("The fact that **by Precor's own testimony**, the majority of subjects

experienced inaccurate heart rate readings means that Precor cannot rely on individual

differences to account for the differences in performance.") (emphasis added). Plaintiffs'

misrepresentation claims are squarely in line with *Mullins* because, like in *Mullins*, "[t]he key

point is that whether the representations were false or misleading is a common question suitable

for class treatment, even if [the product worked] for some consumers." *Id.* at 674.[19]

    *Mullins* involved the sale to consumers of a joint supplement, Instaflex, which, among

other things, defendant Direct Digital advertised as "clinically tested" and "scientifically

formulated." *Mullins*, 795 F.3d at 673. Like Plaintiffs here, the *Mullins* plaintiffs pursued

consumer fraud claims for false advertising. In opposing class certification, Direct Digital

argued, as Precor has here, that too many individual issues relating to consumer physiology

predominated over common issues. The Seventh Circuit rejected that argument out of hand:

> ***Direct Digital's objection fails because it has mischaracterized Mullins's theory
> of liability***. Mullins does not claim that Instaflex was ineffective, ergo defendant
> is liable. He alleges that Direct Digital's statements representing that Instaflex has
> been "clinically tested" and "scientifically formulated" to relieve joint discomfort,
> improve flexibility, increase mobility, and repair cartilage are false or misleading
> because they imply there was scientific support for these claims but in fact no
> reasonable scientific expert would conclude that glucosamine sulfate (the primary
> ingredient in the supplement) has any positive effect on joint health. Mullins
> alleges that these statements would have misled a reasonable consumer. As the
> district court correctly concluded, this theory presents a common question: ***Were
> the statements false or misleading? This is a "common contention" that is
> "capable of classwide resolution" because the "determination of its truth or***

---

[19] Commonality is also met because class members' rights are affected by standardized
brochures and advertisements. *See Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 338-39 (N.D.
Ill. 1997) (holding that where all class members receive "virtually identical written materials,"
common fact issues predominate). *Cf Barden v. Hurd Millwork Conspiracy, Inc.*, 249 F.R.D.
316, 318 (E.D. Wis. 2008) (finding commonality is met where class members' claims arise out
of similar products subject to the same warranty).

> *falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.*"  Nothing more is required to satisfy Rule 23(a)(2).

*Mullins*, 795 F.3d at 673 (internal citations omitted) (emphasis added).  *See also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756-57 (7th Cir. 2014) (finding commonality is satisfied where plaintiff's theory of liability turns on proving unfair or deceptive marketing and packaging of consumer product)); *see also McCrary v. Elations Co., LLC*, No. EDCV 13-00242, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014) (certifying class of purchasers of dietary joint supplement beverage where the theory of liability was consumer fraud because the veracity of the misrepresentations was a key common issue that could be proved with common evidence and rejecting defendant's argument that since certain users were happy with the product, individual issues predominated common issues).

Plaintiffs' case is similarly focused exclusively on one common question: did Precor misrepresent the accuracy and reliability of the Touch Sensor feature?  Individual issues of user physiology are not relevant to this inquiry.  The Court has previously opined that *Mullins* differs slightly from this case in that unlike in *Mullins*, here the Plaintiffs have to prove "that the technology did not work as represented," whereas in *Mullins*, the plaintiffs only had to prove "that the accused tablets were 'clinically tested' and 'scientifically formulated.'"  Dkt. No. 145 at 18-19.[20]  However, like in *Mullins*, Plaintiffs will resolve the common issue here with common proof.  For example, Plaintiffs will use common proof to show that Precor uniformly advertised that "whether you walk or run," the SmartRate feature on its treadmills allows users to

---

[20] In making this distinction, the Court stated that here (unlike in *Mullins*), physiological attributes are relevant since "they affect how well the technology performs."  Dkt. No. 145 at 19.  However, whether physiological attributes *may* impact one's heart rate is irrelevant in that even if true, that does not negate that motion artifact *does* impact heart rate readings and as a result, touch sensors *are not reliable* at speeds above 4 miles per hour.  Nonetheless, this issue is irrelevant since as stated herein, the Plaintiffs are able to prove with common proof that "the technology [does] not work" when speed is increased to 4 miles per hour or greater.

"maximize" their workouts and stay in their "target zone." Plaintiffs will also show using common proof that Precor was well aware that this feature provide inaccurate readings when the speed is increased to 4 miles per hour because (1) it was in possession of studies that proved its statements were not accurate, (2) internal emails produced in discovery show that these misrepresentations were known and of concern to Precor, and (3) Precor's own expert in this case performed testing that proves the Touch Sensors are inaccurate and unreliable.

### C.     There are No Individualized Damages Issues

"Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim." *Smilow*, 323 F.3d at 40. *See also Walsh v. Pittsburgh Press Co.*, 160 F.R.D. 527, 531 (W.D. Pa. 1994) ("Although the amount of the recovery for each employee may differ, such a determination of amount of recovery will, according to Plaintiffs, be based on a mathematical formula, and will not render the class action unmanageable."); *Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 4-5 (D.D.C. 1992) (denying motion to decertify class based, in part, on finding that "a formula which can be applied to each member of the class" could be used to calculate damages); *Sullivan v. Chase Inv. Servs. of Boston, Inc.*, 79 F.R.D. 246, 264 (N.D. Cal. 1978) ("Under these circumstances where damages are 'capable of mathematical or formula calculation,' common questions of damages predominate") (internal citation omitted).

Here, Plaintiffs have submitted Mr. Schwartz's expert report evidencing multiple feasible methods for computing class-wide damages. Regardless, as stated previously, even if damages were *not* capable of common proof – which they are – that fact alone would not, and should not, preclude class certification. *See De La Fuente v. Stokley-Van Camp*, 713 F.2d 225, 233 (7th Cir. 1983) ("It is very common for Rule 23(b)(3) class actions to involve differing damage awards for

-31-

different class members."); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.* 164 F.R.D. 659, 666 (N.D. Ill. 1996) ("It is well established, however, [that] the presence of individualized damages does not render the class unsuitable for certification.").

D.      **A Class Action Is The Superior Method Of Adjudication.**

Rule 23(b)(3) requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) further provides that matters pertinent to a finding of superiority include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

A class action is the superior method of adjudication of this matter because there are thousands if not tens of thousands of Class members who bought Precor fitness machines equipped with Touch Sensors based on uniform misrepresentations. Where class members face insurmountable costs to litigating their claims individually, such as the costs of discovery and experts, then arguably a class action is the only practical means by which class members can obtain relief. As the Seventh Circuit recently observed,

> [T]here is an economy to class treatment of the question of whether [construction products] suffer from a basic design defect, the resolution of which has the potential to eliminate the need for multiple, potentially expensive testimony and proof that would cost considerably more to litigate than the claims would be worth to the plaintiffs. . . . Where there are common issues and the accuracy of the resolution of those issues is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

*Pella II*, 606 F.3d at 394 (citations and quotations omitted). For all of the foregoing reasons, a

class action is the superior method for adjudicating the class members' claims.

## CONCLUSION

Because this case turns on common factual and legal issues which will be proven or disproven by evidence common to the Class, certification is warranted. Plaintiffs' Multi-State Class should be certified; Plaintiffs Mednick and Bayer should be appointed Class Representatives; and Katrina Carroll (Lite DePalma Greenberg, LLC), Joseph J. Siprut (Siprut PC) and Richard Gordon (Gordon Law Offices), should be appointed Class Counsel.

Dated: October 27, 2016

Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

*/s/ Katrina Carroll*
Katrina Carroll, Esq.
*kcarroll@litedepalma.com*
Kyle A. Shamberg, Esq.
*kshamberg@litedepalma.com*
211 W. Wacker Drive, Suite 500
Chicago, Illinois 60606
Phone: 312.750.1265
Fax: 312.212.5919

**SIPRUT PC**
Joseph J. Siprut
*jsiprut@siprut.com*
Richard L. Miller II
*rmiller@siprut.com*
17 N. State Street, Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.477.0553

**GORDON LAW OFFICES, LTD.**
Richard R. Gordon, Esq.
*richard.gordon@gordonlawchicago.com*
211 W. Wacker Drive, Suite 500
Chicago, Illinois 60606
Phone: 312.332.5200
Fax: 312.236.7727
***Attorneys for Plaintiffs and the Putative Class***

619019.1