IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GARY MEDNICK and STEVEN
BAYER, Individually and on
Behalf of All Others
Similarly Situated,

               Plaintiffs,

      v.

PRECOR, INC., a Delaware
Corporation,

               Defendant.

Case No.  14 C 3624
CONSOLIDATED ACTION

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gary Mednick and Steven Bayer's Renewed Motion for Class Certification [ECF No. 149] is granted in part and denied in part.  The Court certifies Plaintiffs' proposed class for the purpose of determining liability, but it reserves the issue of damages for individual hearings.  The Court appoints Mednick and Bayer as class representatives and the attorneys representing them as class counsel.

## I.  LEGAL STANDARD

Plaintiffs here seek to certify a class under Federal Rule of Civil Procedure 23(b)(3).  *See,* ECF No. 149 at 14.  As such, Plaintiffs' proposed class must meet the four requirements of numerosity, commonality, typicality, and adequacy under

Rule 23(a), as well as the predominance and superiority requirements under Rule 23(b)(3). FED. R. CIV. P. 23(a)-(b); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 133 S.Ct. 1184, 1191 (2013). Plaintiffs bear the burden of showing by a preponderance of the evidence that the putative class satisfies these prerequisites. *Bell v. PNC Bank, N.A.,* 800 F.3d 360, 373 (7th Cir. 2015).

The Court exercises discretion in deciding whether to certify a class. *See, Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir. 2008) ("Recognizing that Rule 23 gives the district courts broad discretion to determine whether certification of a class-action lawsuit is appropriate, this court reviews such decisions deferentially. . . .") (internal quotation marks omitted). In making its determination, however, the Court may not accept Plaintiffs' allegations at face value. *See, Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675-76 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). Instead, it must probe beyond the pleadings and resolve any legal or factual disputes necessary to ensure that the prerequisites of Rule 23 have been met. *See, Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011). In so doing, the

Court conducts a "rigorous analysis" that may overlap with the merits of the underlying claims. *Id.*

Finally, "when appropriate," the Court may maintain a class action "with respect to particular issues." FED. R. CIV. P. 23(c)(4). This means that the Court can "carve at the joint" a class action, deciding some issues on a class wide basis and leaving others for individualized determinations. *See, id.; In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1302-03 (7th Cir. 1995).

## II. <u>BACKGROUND</u>

Plaintiffs bring this class action to remedy unfair and deceptive business practices arising from Defendant Precor's marketing and sale of treadmills incorporating "touch sensor heart rate" monitoring technology. The core of Plaintiffs' allegations is that the touch sensor heart rate monitors do not provide accurate heart rate readings. According to Plaintiffs, Precor knows this to be the case. *See,* ECF No. 127 (Am. Compl.) ¶¶ 16, 22, 27; ECF No. 149 at 1-2. Nonetheless, Precor continues to tout the benefits of the technology and fails to inform consumers of its shortcomings, thus harming members of the putative class. *See,* Am. Compl. ¶¶ 5-14, 26; ECF No. 149 at 3-4.

In this Renewed Motion for Class Certification, Plaintiffs have narrowed their proposed class to residents of five states

who purchased certain Precor treadmills within the statute of limitation period set by each of the states. In particular, Plaintiffs define the class as:

> All persons who purchased, within the time period outlined below, a Precor Home Treadmill equipped with a touch sensor heart rate monitor from either Precor or a third-party retailer and who are residents of California, Illinois, Missouri, New Jersey, and New York. Excluded from the Class are defendant herein [and certain other persons].

ECF No. 149 at 14. In the alternative, Plaintiffs ask the Court to certify a class of only Illinois residents. *Id.* at 15.

The putative class seeks to recover for violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and the equivalent consumer protection statutes of the other four states. ECF No. 149 at 14. According to Plaintiffs, Precor violates the states' consumer protection laws by marketing touch sensor heart rate monitors that do not work. Plaintiffs bring evidence to bear on both of these factors, attempting to show that (1) Precor markets the heart rate monitors by making representations regarding their performance, and (2) the monitors do not perform as advertised.

As evidence of Precor's allegedly deceptive advertising, Plaintiffs point to three types of representations. First are the brochures that Precor creates and distributes. The brochures highlight the heart rate monitoring technology incorporated in the treadmills. For example, a brochure crows:

"Maximize your workout results whether you walk or run with touch and telemetry heart rate monitoring." ECF No. 149, Ex. 1. Plaintiffs do not allege that Precor distributes the brochures directly to consumers; instead, they say that Precor sends the brochures to third-party retail stores to train the sales staff and to serve as marketing materials at the point of purchase. *See,* ECF No. 149 at 6; ECF No. 127 ¶ 9.

Second, Plaintiffs allege that Precor's website makes representations regarding the benefits of the heart rate monitors that are similar to those found in the brochures. Precor protests that Plaintiffs did not encounter either the brochures or its website prior to their purchase.

Third, Plaintiffs draw attention to the treadmill machines themselves. On the treadmills are graphics indicating that the heart rate monitoring technology is present. These graphics include the word SmartRate, a trademarked term for the visual display that shows a user's heart rate, and a picture of a heart. Plaintiffs assert that these graphics make "representations regarding [Precor's] heart rate features on the machines." ECF No. 149 at 7; ECF No. 127 ¶¶ 11-12. Unlike the case with the brochures or the website, Plaintiffs presumably did see these graphics, along with other packaging features of the treadmills, since they tried out the heart rate monitors on the machines before making their purchase.

As evidence that the touch sensor heart rate monitors do not work, Plaintiffs bring two sources of data that speak to their performance. Both were submitted and considered in the Court's earlier opinions. The Court here covers them again in some detail for the sake of completeness.

The first is an independent investigation by Precor's expert, Michael Garrett ("Garrett"). *See,* ECF No. 158 Ex. 1 (Garrett's Suppl. Rep.). Garrett performed testing on 22 prescreened individuals of different ages, heights, weights and cardio-physiologies. These subjects had their heart rates measured by the touch sensors while exercising on two different treadmills. Garrett then compared the heart rate readings from the touch sensor to readings from a chest strap electrocardiogram ("ECG") worn by the subjects.

As Precor explains, there are three different heart rate monitoring systems embedded in the treadmills that Plaintiffs have defined to be part of the class products. *See,* ECF No. 158, Ex. 6 (Brown's Decl.) ¶¶ 4-8, Table 3. The systems are known as the Alatech, Polar, and Salutron, and each uses a different algorithm for converting the signals that it receives from the user into a heart rate reading. *See, id.* ¶ 7. Garrett's testing covers two out of the three systems: the Alatech and Polar.

Test results for both treadmills show that when the subjects ran at speeds below 4 mph, (virtually) all subjects received readings from the touch sensors that were consistent with those from the chest straps. *See,* Garrett's Suppl. Rep., at 50 Fig. 24 & 51 Fig. 31. Beginning at 4 mph, however, the readings from the touch sensors and chest straps started to diverge. For example, at a 4 mph jog, six out of 21 subjects who used the Alatech-based treadmill had heart rate readings from the touch sensor that diverged by 10% or more from their chest strap's readings. *Id.* at 50 Fig. 24.

The results worsened still at 6 mph. At this speed, the majority of subjects, some 60%, experienced a difference of more than 10% between the two readings. *See,* Garrett's Suppl. Rep. at 50 Fig. 24 & 51 Fig. 31. Thus, assuming that the chest strap's readings are accurate, the touch sensor's measurements were inaccurate for a majority of subjects when they got up to speeds of 6 mph.

Although Garrett made some adjustments to the presentation of the results in his latest report, the overall picture remains the same. Even with the exclusion of several subjects on the grounds that their hand heart rate amplitudes fell below a certain threshold, still more than 40% of the subjects had inaccurate measurements when they reached running speeds of 6 mph. *See, id.* at 51 Fig. 29, 52 Fig. 32. Of the subjects who

were not excluded, more had inaccurate than accurate heart rate measurements.

The second source of data that speaks to the performance of the heart rate monitor is a study by Lee and Mendoza. *See,* ECF No. 158, Ex. 11 (Lee & Mendoza). The authors of the study used a similar, but not identical, procedure to that employed by Garrett to test the reliability of the Salutron heart rate monitoring system, the one system that was not covered by Garrett's testing. Like Garrett, Lee and Mendoza had prescreened individuals using a Precor treadmill and compared their heart rates as measured by the treadmill's touch sensor against those measured by a chest strap. The heart rate readings came from 25 subjects who did 3-minute periods each of standing, 2 mph walking, 3.5 mph walking, 4.5 mph jogging, and 6 mph running. During the exercises, a lab technician prompted the subjects to obtain their heart rate via the touch sensor at 60-second intervals.

Lee and Mendoza concluded from their investigation that the Salutron touch sensor heart rate monitors "provide valid estimates of heart rate . . . during treadmill exercise." Lee & Mendoza at 52. This conclusion holds even at the highest tested speed of 6 mph. The authors found that although the discrepancies between the treadmill's and chest strap's readings

widened at this speed, the two measurements remained highly correlated. *See, id.* at 53-54.

Lee and Mendoza made two notes of caution to their results. First, they acknowledged that "during the jogging and running conditions, the percent of measurements successfully obtained from the sensors tended to decrease . . . with increasing exercise intensity." Lee & Mendoza at 54. That is, while the researchers were able to capture about 116 heart rate readings from the touch sensor when the subjects were walking at 2 mph, they were able to obtain only 75 readings when the subjects were running at 6 mph. *Compare, id.* Fig. 2, *with* Fig. 5; *see also,* Fig. 6. Second, Lee and Mendoza warned that because "all of the participants in our study were young, healthy adults," they could not say "if the sensors would provide the same degree of validity in other populations." *Id.* at 54.

Precor contests Plaintiffs' evidence purporting to show that the heart rate monitors on its treadmills do not work. The company does not argue that its touch sensor technology works for all users on all treadmills. Instead, it contends that the inaccuracies were driven by differences in "individualized physiologic factors . . . such as age, body mass and weight, medical conditions and medications." ECF No. 158 at 15-16.

Moreover, Precor presses the fact that its treadmills come with disclaimers about the heart rate monitors' performance.

For example, Plaintiff Bayer's owner's manual contains the following warning: "Touch heart rate performance may vary based on a user's physiology, age, and other factors. You may experience an erratic readout if your hands are dry, dirty or oily or if the skin on your hands is especially thick." ECF No. 158 at 7. Precor also relies on information available on its website, which to the question "Why is my touch heart rate reading erratic or nonexistent?" answers, in part, "Some people have stronger pulse in their hands compared to others. Your results may vary." *Id.* The website also advises users to "gently grasp the sensors" and maintain "warm and moist" hands to improve the performance of the touch sensor. *Id.*

Plaintiffs counter that these disclaimers are not provided at the point of sale. They also point to the numerous complaints that Precor has received on its touch sensor technology. *See,* ECF No. 149 at 3 & Ex. 2. Given the independent testing showing that the heart rate monitors' performance deteriorates as users get up to higher speeds, Plaintiffs now emphasize the inability of the technology to measure the heart rate as the users "run," a term used to denote a moving speed of at least 4 mph and certainly a 6 mph pace.

Finally, Plaintiffs resubmit a damages report that was included with their first Motion for Class Certification. *See,* ECF No. 149, Ex. 10. Plaintiffs' damages expert, Jonathan

Schwartz ("Schwartz"), argued that class members should be compensated "for the diminished value of the cardiovascular exercise equipment given that the class members paid for a feature of value, the touch sensor, which is alleged to not have any actual value." *Id.* ¶ 12. Putting a number on this diminished value required Schwartz to estimate the price that Precor treadmills would have sold for without "the inclusion of the touch sensor," and he proposed two methodologies for doing so.

On the strength of this evidence, Plaintiffs ask the Court to certify the class. The Court grants the Motion in part.

### III. <u>ANALYSIS</u>

Before reaching the merits of the Class Certification Motion, the Court first addresses an evidentiary issue. Precor has moved to strike an exhibit relied upon by Plaintiffs in their Motion. The exhibit is a document produced by Precor during discovery but otherwise contains no authenticating information, including the identity of the author. *See*, ECF No. 149, Ex. 2. The document suggests that Precor had received complaints about its heart rate technology, where the top complaints were "HR erratic, HR not working at all, . . . , [and] HR giving false readings." *Id.* The document also says that "sales relies heavily on selling HR as part of the 'Precor Experience'." *Id.* The unidentified writer concludes that "we

need to look at our options to determine the best route for getting costs down and improving the product," but that "as of now, no action has been taken." *Id.* Plaintiffs use the document to make the case that Precor was aware of the problems with its touch sensor technology but nonetheless chose to market and sell the product.

Precor argues that the document should be excluded because it violates Rules 401, 402, 403, and 901 of the Federal Rules of Evidence. The Seventh Circuit has not spoken on the issue of whether the Rules apply at the class certification stage. *See*, *Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.*, No. 11 C 06791, 2013 U.S. Dist. LEXIS 155727, at *9 (N.D. Ill. Oct. 30, 2013) ("The federal courts of appeals have not directly addressed whether evidence used in a class-certification motion must be admissible under the Federal Rules of Evidence."). Courts in this district have leaned both ways. *Compare, e.g., In re Yasmin & Yaz Mktg.,* No. 3:09-cv-20001-DRH-PMF, 2012 U.S. Dist. LEXIS 33183, at *24 (S.D. Ill. Mar. 13, 2012) (crediting the position that "the Federal Rules of Evidence apply at the class certification stage"), *with Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,* No. 09-cv-0852, 2016 U.S. Dist. LEXIS 82434, at *9 (E.D. Wis. June 24, 2016) ("Defendants cite no authority in support of their claim that evidence submitted in support of class certification must first be found admissible

under the Federal Rules of Evidence. . . . Class certification must be considered at an early practicable time . . . making objections based on admissibility and authenticity premature.") (internal quotation and alteration marks omitted).

The Court need not take a position on this open issue. The outcome of the Motion at hand remains the same whether or not the Court considers the document. The Court exercises its discretion to take account of the exhibit but puts limited weight on it. *See, Quality Mgmt.,* 2013 U.S. Dist. LEXIS 155727, at *9 (noting that regardless of whether the Rules are applied stringently "district courts exercise broad discretion when ruling on a class-certification motion"). The Court chooses to do so because, as Plaintiffs admit, the document speaks to the state of events in 2008, "way before [Precor] sold any treadmill at issue in this case." ECF No. 164 at 10. The "HR" technology discussed by the unidentified memo writer thus may not be the same technology incorporated in the class products in this case.

## A. Standing

The Court must also dispose of the old issue of standing. For a third time, Precor urges that Plaintiffs do not have standing to sue for any treadmill other than the 9.33 Model Treadmill they purchased. The Court rejected this argument both in its order denying Precor's Motion to Dismiss and in its last ruling allowing Plaintiffs to amend their Complaint. *See,*

ECF No. 38 (Order Denying Mot. Dismiss) at 8-11; ECF No. 145 (Order Giving Leave to Am. Compl.) at 8-21. Precor may disagree with the Court's ruling, but if so, the company has not given the Court any reason to reconsider it.

Precor brings no new argument, no overlooked legal authorities, and no fresh evidence in its latest attempt to dispel standing. While the Court would have been willing to take another look at the issue, especially in light of the conflicting approaches adopted by the different circuits and the Court's attempt to reconcile these approaches as announced in the previous opinion, *see,* ECF No. 145 at 8-21, it will not do so on a stale record.

To the extent that Precor offers anything new, it is the emphasis the company now puts on the Lee and Mendoza study. The study purportedly shows that a Salutron-based treadmill accurately measured a user's heart rate even at 6 mph. If the result is credible, then the Salutron is a better heart rate monitoring system than the Alatech or Polar. If, in addition, this difference is pronounced and visible enough so that consumers would not consider the Alatech and Polar to be a good substitute for the Salutron, then this is a reason to exclude treadmills with the Salutron system from the class products. *See,* ECF No. 145 at 14 (holding that "standing should be granted when the products are near substitutes to one another.

Otherwise, standing should be denied."). However, Precor has not made any argument as to the substitutability of the heart rate monitoring systems. As it stands, whether the systems actually work is a matter that goes to the merits of Plaintiffs' consumer fraud claims, not something to be considered under the aegis of standing. *See, Arreola,* 546 F.3d at 795 ("Standing is a prerequisite to filing suit, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is entitled to relief.") (emphasis removed); *see also, Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012) (warning that "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits").

Moreover, the Lee and Mendoza study does not conclusively establish that the Salutron heart rate monitoring system works at high speeds. Recall the caveat from the study that the Salutron-based machine captured fewer heart rate readings when the subjects ran. More precisely, the touch sensor obtained 75 readings from 25 subjects during the 3-minute exercise intervals, about 35% fewer readings than when the subjects walked. Further recall that the 25 subjects were prompted three times during the exercise to grip the sensors until they were able to obtain a heart rate reading. This means that there were 75 prompts in total, the same number of readings obtained. It

appears then that the touch sensor monitor was able to measure the heart rate only when the subjects were prompted by the lab technician. Because the prompts came 60 seconds apart from each other, this suggests that the touch sensor captured only one reading per minute of exercise.

Despite these oddities, the authors conclude that the readings were accurate. However, they do not disclose what the lab technician said to the participants in prompting them. They do not explain how the prompts were able to improve the heart rate monitor's performance so that the monitor went from not being able to capture a heart rate at all to being able to get a reading as accurate as that obtained by the chest strap. The researchers also do not say why the participants needed to be prompted to take this action or how feasible it is to maintain the action for exercise durations longer than three minutes.

Lee and Mendoza do, however, openly acknowledge that the results of their study may be valid only for a "healthy, young adult population." ECF No. 158, Ex. 11 at 54. As the authors say, they "do not know if the sensors would provide the same degree of validity in other populations." *Id.* The average participant in the Lee and Mendoza study was 27 years old and had a body mass index of 22.2. *Id.* at 49. All of the participants "regularly engaged in physical activity and were accustomed to exercise bouts." *Id.* All were "apparently

healthy," as reflected in their medical histories and completed health questionnaires. *Id.* Precor has made no suggestion that the study participants are similar to the population of Precor treadmill users at large. Thus, even assuming that the Salutron heart rate monitor works as advertised for young, healthy adults, one cannot infer that the technology meets the same level of performance for putative class members.

In sum, the Lee and Mendoza study is not sufficient to upset the Court's finding that Plaintiffs have standing as to the unpurchased treadmills. Since Precor has presented no other new evidence or argument, the Court's ruling stands.

## B. Uncontested Class Certification Requirements

The Court finally reaches the class certification analysis. Of the Rule 23 requirements that Plaintiffs must demonstrate to certify the class, Precor does not contest that numerosity and superiority are met. Precor also does not challenge the adequacy of Plaintiffs' current attorneys to act as class counsel should the class be certified. The Court thus makes summary findings as to these prerequisites.

Plaintiffs allege that Precor markets and sells thousands of treadmills to consumers who are defined to be members of the proposed class. Joinder of thousands of class members is impractical. *See, Cima v. WellPoint Health Networks, Inc.,* 250 F.R.D. 374, 378 (S.D. Ill. 2008) ("A class of more than 40

individuals raises a presumption that joinder is impracticable.") (quoting *Carrier v. JPB Enters., Inc.,* 206 F.R.D. 332, 334 (D. Me. 2002)) (internal quotation marks omitted). Therefore, Rule 23(a)(1)'s requirement of numerosity is satisfied. *See,* Fed. R. Civ. P. 23(a)(1).

Likewise, superiority is satisfied because the recovery for each class member in this case is likely to be small, at least in comparison with the costs of bringing a lawsuit. Although a treadmill may be a large purchase, the heart rate monitor is but one part of that machine. A preliminary estimate by Plaintiffs' damages expert puts actual damages from Precor's alleged wrong at no more $165 per class member. *See,* ECF No. 149, Ex. 10 ¶ 17. As far as the Court is aware, the potential recovery has not created an incentive for any treadmill user to bring an individual lawsuit. In light of these facts and the Seventh Circuit's pronouncement that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997), the Court finds that a class action is superior to other methods for fairly and efficiently adjudicating the common issues in this case. *See,* Fed. R. Civ. P. 23(b).

As for the adequacy of class counsel, Plaintiffs' attorneys have ably conducted themselves as interim class counsel, and the Court has no reason to think that they will not continue to advocate zealously for the interests of the class. *See,* FED. R. CIV. P. 23(g).

The Court now turns to the remaining elements of Rule 23: commonality, typicality, and predominance. It analyzes commonality and typicality with the consumer protection statute of Illinois in mind since Plaintiffs, both residents of Illinois, have sought to certify an Illinois consumer class as an alternative to their multi-state class action. The Court broadens its consideration to the laws of the other four states as part its predominance analysis. *See, e.g., Tylka v. Gerber Prods. Co.,* 178 F.R.D. 493, 497-98 (N.D. Ill. 1998) (analyzing the consumer fraud statutes of different states under the predominance prong of Rule 23).

## C. Commonality

To show commonality, Plaintiffs must affirmatively demonstrate that there is at least one question "of law or fact common to the class." FED. R. CIV. P. 23(a)(2); *see, Wal-Mart,* 564 U.S. at 350, 359. However, the mere raising of a common question is not enough. Instead, the question must "generate common answers apt to drive the resolution of the litigation."

*Id.* at 350 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rᴇᴠ. 97, 132 (2009)).

Plaintiffs propose eight questions that they say raise issues of law and fact common to all class members. *See,* ECF No. 149 at 17-18. The Court agrees that several of these questions, as clarified and limited, raise an issue capable of classwide resolution. *See, Wal-Mart,* 564 U.S. at 350 (holding that any common issue "must be of such a nature that it is capable of classwide resolution").

These questions boil down to whether Precor engaged in representations or omissions that were likely to deceive a reasonable consumer. Under the Illinois consumer protection act, these questions may be answered using evidence common to the class. Moreover, their answers drive the resolution of the litigation because they help to determine liability under the statute.

To state a private cause of action under the ICFA, Plaintiffs must point to a materially deceptive representation or omission that proximately caused their injury. *See, Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 501, 504-05 (1996). The parties do not dispute that whether a representation is materially deceptive or misleading is determined by asking whether a reasonable person "would have acted differently knowing the information." *Id.* at 504-05; *see, In re ConAgra*

*Foods, Inc.,* 90 F.Supp.3d 919, 996 (C.D. Cal. 2015) ("To be actionable under the ICFA, a representation must be 'material'; this is established by applying a reasonable person standard."). Because the reasonable person standard calls for an objective analysis, whether Precor engaged in representations or omissions that were likely to deceive a reasonable consumer is a question capable of classwide proof.

Nonetheless, Precor argues that this question cannot establish commonality for two reasons. First, Plaintiffs admit that they did not view any of Precor's promotional materials before making their treadmill purchase. Second, Precor publishes disclaimers on the touch sensor's performance. The first argument is a challenge to the proximate causation element of the ICFA, while the second attacks the materiality of the representations. The Court addresses each in turn.

### 1. Whether Plaintiffs' injuries could be proximately caused by Precor's promotional materials

"[T]o properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act, a plaintiff must allege that he was, in some manner, deceived." *Oliveira v. Amoco Oil Co.,* 201 Ill. 2d 134, 155 (2002). Although "the required allegation of proximate cause is minimal," *Connick,* 174 Ill. 2d at 504, at the very least Plaintiffs must be able to plead that class members were

exposed to Precor's allegedly deceptive advertising. One cannot be deceived by what one did not see, and this personal exposure to the alleged misrepresentation is crucial under Illinois law.

Although the issue has not always received the emphasis it has now, its importance emerged with *Zekman v. Direct Am. Marketers,* 182 Ill. 2d 359 (1998). In *Zekman,* the Illinois Supreme Court rejected the argument that the plaintiff could have been deceived by the alleged misrepresentations contained in his phone bills. *Id.* at 375-76. The court took pains to quote from the plaintiff's deposition testimony where he admitted that, "I don't see the bills. I don't pay the bills." *Id.* at 366. "Accordingly," said the court, "plaintiff could not have been misled by the allegedly deceptive nature of the bills." *Id.* at 375.

While the plaintiff in *Zekman* made other admissions that also undermined his ICFA claim, the Illinois Supreme Court has isolated and directly addressed the issue of whether a plaintiff must be exposed to the alleged misrepresentations in two subsequent cases. In *Oliveira,* the plaintiff Oliveira advanced a "market theory" of proximate causation. *See,* 201 Ill. 2d at 140-41. Oliveira did not claim that "he saw, heard or read any of the allegedly deceptive advertisements." *Id.* at 140. Rather, he alleged that the "defendant's allegedly deceptive advertising scheme increased demand for defendant's premium gasolines." *Id.*

The increased demand drove up prices, thus harming all purchasers of the defendant's gasoline. *Id.* at 141. Oliveira accordingly relied on the market – or other people – having seen, heard, and read the advertisements.

The court rejected Oliveira's theory. *Id.* at 154-55, 157. As it stated, "[b]ecause plaintiff does not allege that he saw, heard or read any of defendant's ads, plaintiff cannot allege that he believed that he was buying gasoline which [carried the premium benefits represented in the ads]." *Id.* at 155. Oliveira's claim, like that of Zekman*,* "failed as a matter of law" because the plaintiff could not have been deceived. *Id.* at 154.

The court affirmed the principle again in *Shannon v. Boise Cascade Corp.,* 208 Ill. 2d 517, 524-26 (2004). Relying on *Zekman* and *Oliveira,* the court found that the plaintiffs' ICFA claim must fail when they did not "allege that any deceptive advertising by [the defendant] Boise Cascade was received by any plaintiff, or that it was received by any builder, architect, engineer, or other like person somehow connected with a plaintiff." *Id.* at 525.

The Seventh Circuit has adopted the same approach in dealing with class actions. As the court stated in *Oshana v. Coca-Cola Co.,* "a damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the

deception." *Oshana,* 472 F.3d 506, 513-14 (7th Cir. 2006) (citing *Oliveira,* 776 N.E.2d at 164). The *Oshana* court rebuffed the argument that the defendant Coca-Cola committed a *per se* violation of the ICFA, or a violation that requires no person to have been misled or deceived, when it allegedly represented that "a product has ingredients that it does not have." *Id.* at 514-15. The court then affirmed the denial of class certification because the plaintiff admitted, among other things, that she "did not see any Coke advertisements during the relevant period." *Id.* at 514.

The case law thus dictates that Plaintiffs cannot rely on the representations from Precor's brochures and its website in making out their ICFA claims. Plaintiffs not view these materials themselves before making their purchases. More importantly, there is no feasible way to ascertain on a classwide basis whether members of the class were exposed to the representations.

To no avail then did Plaintiffs stress the details of their encounters with the sales representatives or their online research. To begin with, Plaintiffs could only testify to implicit representations by the sales representatives and vague online searches that may not have uncovered any information on the heart rate monitors. *See,* ECF No. 149, Ex. 17 (Bayer's Dep.) 24:2-30:10 ("Q: Do you recall anything specifically Mr.

Johnson [the sale representative] said about the heart rate system on the 9.23? A: No.") ("[T]he research that we did on Precor when we purchased or before we purchased [the treadmill] was the on-site visit, what we saw in the treadmill, what we heard from the salesperson, and we had essentially made up our mind at that point but I may have done a Google search on Precor devices or, you know, checked their status online, you know, or visited the site possibly."); ECF No. 149, Ex. 18 (Mednick's Dep.) 33:4-38:7. Moreover, even if Plaintiffs could prove that they received the brochures or read the relevant information from Precor's website, they still cannot show that their fellow class members (or some significant fraction thereof) had the same experience.

In other words, statements in Precor's brochures and on its website cannot serve as the common misrepresentations to the class. The in-person representations from the retail store personnel, including any reference to the brochures, fail because "oral representations may vary substantially from one dealer (or occasion) to another," thus "destroying the commonality of the claims." *Szabo,* 249 F.3d at 674. Likewise, the website is deficient since determining that a particular class member visited the website before the purchase and saw the alleged misrepresentations does not say anything about whether the next class member did so as well. The representations

contained in the brochures and website therefore must be excluded in determining whether Precor made materially deceptive representations in marketing and selling the touch sensor heart rate monitors. *Cf. Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 589 (C.D. Cal. 2011) (finding the plaintiff's allegation adequate when "Plaintiff alleges a single misrepresentation that was made identically to all potential class members").

Plaintiffs' arguments to the contrary are unpersuasive. While it is true, as Plaintiffs argue, that the ICFA does not require reliance, the statute does require proximate causation. *Connick,* 174 Ill. 2d at 501 ("Plaintiff's reliance is not an element of statutory consumer fraud . . . , but a valid claim must show that the consumer fraud proximately caused plaintiff's injury. . . ."). As explained above, this means that class members must have seen the alleged misrepresentations. Because it cannot be proved by a generalized method that class members saw or heard information contained in the brochures or on Precor's website, that information cannot support an ICFA claim in this class action.

Plaintiffs also attempt to rely on a finding from *Connick*. Again, it is true that the *Connick* court found that the representations the defendant had made to a magazine "adequately stated a cause of action for consumer fraud." *Connick,* 174 Ill. 2d at 503. It is also true that the court made this

determination without any discussion as to whether the plaintiff actually saw the magazine article. However, *Connick* was decided before *Zekman* and its line of cases. Moreover, in *Connick,* the court was reviewing a motion to dismiss and not a motion for class certification. *See, id.* at 487-88. The court thus took at face value the allegation that the defendant "undoubtedly knew that many prospective purchasers would read the review" published by the magazine. *Id.* at 504.

The procedural posture of this case is different. The Court is asked here to rule on a class certification motion. As such, the Court does not need to – and indeed should not – accept uncritically Plaintiffs' allegations. *See, Szabo,* 249 F.3d at 675-76. While Plaintiffs have alleged that the brochures were distributed to the retail stores with the intention that the information eventually reach the consumers, the information actually gets to the consumers only if the sales representatives parrot it to their customers or hand them the written materials. But there is no method for determining on a classwide basis whether this happened. According to Plaintiffs' deposition testimonies, their sales representatives neither repeated the information nor gave them a brochure. Likewise, there is no actual evidence suggesting that "many prospective purchasers" of Precor treadmills visited the company's website

and read its representations regarding the heart rate monitors before purchasing their treadmills.

Plaintiffs attempt to skirt the issue of spotty exposure by lumping the brochures, the website, and the information on the treadmills together. According to Plaintiffs, "whether through sales personnel using standardized representations by Precor, in product brochures created by Precor, on Precor's website . . ., or on the actual exercise equipment itself," the consumer receives the same consistent (but false) message from Precor. The Court disagrees that the information from the different sources is similar enough to be treated as fungible. For example, the phrase "whether you walk or run" – frequently emphasized by Plaintiffs for the reason that the heart rate monitors appear to malfunction when the users run – is found only on one of the brochures. It is not present in other brochures, on Precor's website, or on the machines themselves. Based on the current record, the Court declines Plaintiffs' invitation to find that exposure to a particular misrepresentation is immaterial because the brochures, website, and treadmill graphics may be treated as interchangeable. *Cf. Suchanek v. Sturm Foods, Inc.,* 311 F.R.D. 239, 262 (S.D. Ill. 2015) (holding that two different packages containing alleged misrepresentations are not an obstacle to certification of a single class when the packages are "nearly identical").

Nonetheless, Plaintiffs' quest for a common misrepre-
sentation is saved by two things: the graphics on the Precor
treadmills themselves and any material omissions by Precor. To
take the omissions first, Precor either knew or it did not that
the touch sensor heart rate monitors do not accurately measure
the heart rate. Likewise, Precor either told its customers of
this fact or it did not. Any alleged omission therefore is
common to the class.

In the same vein, all treadmill purchasers presumably saw
the graphics on the machines. Courts routinely find that
whether a product packaging, seen by all purchasers of the
product, is misleading is an issue that satisfies commonality.
In *Suchanek,* for example, the plaintiffs brought a class action
complaining of alleged misrepresentations printed on the
packaging of coffee pods that the defendant sold. *See Suchanek,*
764 F.3d 750, 752-53 (7th Cir. 2014). The packaging was "nearly
identical" from class product to class product. *Suchanek,* 311
F.R.D. at 262. The same (or nearly so) representation thus was
seen by all class members. In such a case, the district court
erred in finding that there were no questions common to the
class. *Suchanek,* 764 F.3d at 756-57. This is because "the
question whether the [defendant's] GSC packaging was likely to
deceive a reasonable consumer is common to the class." *Id.* at
757*. See also, In re ConAgra Foods, Inc.,* 90 F.Supp.3d at 996-

98, 1035-36 (certifying a class alleging violations of the ICFA when the defendant "ConAgra made the same alleged misrepresentation on each bottle of Wesson Oils purchased by class members during the class period"); *Ries v. Ariz. Bevs. USA LLC,* 287 F.R.D. 523, 537 (N.D. Cal. 2012) (similar).

This case is analogous to *Suchanek*. Plaintiffs have alleged – and Precor does not contest – that all the treadmills at issue contain nearly the same representations regarding the presence of the heart rate monitors. As for whether those representations actually amount to a materially deceptive statement about the touch sensor technology, this is a question that goes to the merits of Plaintiffs' ICFA claim. Since the question is capable of being answered with classwide proof by assessing whether a reasonable person would find the representations deceptive, the Court need not consider it at this stage. *See, Amgen,* 133 S.Ct. at 1195 ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *Bell,* 800 F.3d at 376 ("A proposed class of plaintiffs must prove the existence of a common question, and one that predominates over individual questions, but it need not prove that the answer to that question will be resolved in its favor."). The Court thus leaves the factfinder to assess whether the packaging of the

Precor machines – which includes the SmartRate mark, the picture of the heart, and their surrounding context – indeed broadcasts a misleading message.

### 2. Whether the representations could be materially misleading given the disclaimer information

Similarly, because Precor's disclaimers are relevant to the extent that they lessen the impact – that is, the materiality – of any misrepresentation or omission, the effect of the disclaimers is properly left to the merits stage of the case. *See, Amgen,* 133 S.Ct. at 1195; *Bell,* 800 F.3d at 376. Moreover, the Court is not prepared to find on the record before it that the disclaimers render the alleged misrepresentations immaterial. As Plaintiffs point out, the disclaimers are not provided at the point of sale. It is possible, therefore, that the disclaimers do not nullify the effect of any alleged misrepresentations on the reasonable consumer.

The content of the disclaimers also leaves open the question of whether they adequately convey to consumers that the touch sensor heart rate monitor may not work for them. The disclaimers fall into two categories: those that tell the consumers to adjust their behavior to improve the performance of the heart rate monitors (*e.g.,* "gently grasp the sensors") and those that tell the consumers that no matter what they do, the

touch sensor may not work due to inherent "individualized physiologic factors" (*e.g.,* "your results may vary").

With regard to the first kind of disclaimers, the Court notes that participants in Garrett's study were given similar instructions on how to use the touch sensor heart rate monitors. Yet, they still failed to get accurate heart rate measurements as they began to run. This suggests that either following Precor's instructions does not actually improve the performance of the touch sensor, or that the instructions are so difficult to follow that the majority of users cannot adhere to them. The number of complaints that Precor has received on the touch sensors gives rise to the same inference. Whatever instructions and warnings Precor provides, its users still appear disappointed and unable to make the heart rate monitors work.

As to the disclaimers that the touch sensor may not work because of individual differences, Plaintiffs cabin their effectiveness by focusing on the heart rate monitors' performance as users run on the treadmills. Recall that most individuals in Garrett's study experienced inaccurate heart rate measurements when they ran. If Precor's touch sensor monitors do not work, then it appears that they do not work for the majority of individuals, not just a few who happen to have unusual physiologies. Plaintiffs also correctly point out that characteristics like age, height, weight, and medical condition

do not change just as a user increases his moving speed. The physiological differences across individuals thus cannot explain why the touch sensor works at low speeds but not at higher ones for the same individuals.

In sum, the Court finds that the disclaimers do not resolve in the negative the common question of whether Precor engaged in representations or omissions that were likely to deceive a reasonable consumer.

### 3. *Whether common issues extend beyond liability*

The common question identified above speaks to the issue of liability under the ICFA. If Precor indeed engaged in representations or omissions that were likely to deceive a reasonable consumer, then it is liable for violating the statute. However, the question does not shed light on the amount of damages that each member of the class, or the class as a whole, is entitled to. This is because members of the class still have to prove that they indeed purchased a class product (a Precor Treadmill Model 9.23, 9.27, 9.33, 9.35, TRM 211, TRM 233, TRM 243, TRM 425, or TRM 445), during the class periods (which vary depending on the state in which the consumer resides), from the relevant parties (Precor or a third-party retailer). *See,* ECF No. 149 at 14 n.12.

In addition, although each class member's actual damages as a percentage of the purchase price may be determined on a

classwide basis (an issue discussed below under the section examining predominance), Plaintiffs here are asking for recoveries that go beyond actual damages. *See,* ECF No. 127 at 27 (requesting "treble, multiple, disgorgement, and other damages" in addition to compensatory damages). When the Court takes a peek beyond Illinois law, it turns out that the different states differ in what they allow an individual to recover under their consumer fraud statutes. *See,* ECF No. 145 at 30 (noting that California only allows a consumer to recover restitution, whereas Illinois provides for punitive damages at the discretion of the district judge and New Jersey mandates a trebling of damages); *Conway v. Citimortgage, Inc.,* 438 S.W.3d 410, 414 (Mo. 2014) ("[Missouri] courts may award a prevailing party punitive damages. . . ."); *Wilner v. Allstate Ins. Co.,* 893 N.Y.S.2d 208 (App. Div. 2010) (stating that under New York law "consumers may recover actual damages in any amount, and may recover treble damages . . . up to $ 1,000. . . . Moreover, the plaintiffs may seek both treble damages and punitive damages. . . ."). Thus, individual class members' total recoveries will depend on what state they reside in.

For these reasons, the Court concludes that certification of a single class is inappropriate as to the issue of damages. It therefore reserves the issue for individualized hearings. *See, Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 800 (7th Cir.

2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine — if liability is established — the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class . . . for liability alone where damages or causation may require individualized assessments.").

The Court thus conducts the rest of its Rule 23 analysis with the common issue of liability as a guidepost.

### D. Typicality

Rule 23(a)(3) requires Plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Because "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," many of the arguments Precor raised under the typicality heading are already addressed as part of the Court's commonality analysis. *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 157 (1982); *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992) ("The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality."). The Court has also addressed challenges that Precor made to the adequacy of Plaintiffs to act as class representatives since those arguments

overlap with Precor's attack on typicality. *See, Amchem Prods. v. Windsor,* 521 U.S. 591, 625-26 (1997) (stating that the requirement that the named plaintiffs adequately represent the class "tends to merge" with the requirements of commonality and typicality); *see also,* ECF No. 164 (Pls.' Reply Mem.) at 15 n.13 (characterizing Precor's arguments against Plaintiffs' adequacy as attacks on the typicality of Plaintiffs' claims and responding thusly).

One issue remains to be considered. Precor argues that Plaintiffs are not typical because they did not run on their Precor machines. This is relevant because the record shows that the performance of the touch sensor heart rate monitors is most compromised when users run on the machines. At slower speeds, the heart rate monitors appear able to measure accurately the users' heart rates. Precor thus argues that if Mednick and Bayer do not run, their claims are vulnerable to being challenged on this ground unique to them, thereby making them atypical of the class.

The Court finds this argument deficient for three reasons. First, the record does not support the contention that Mednick and Bayer did not run on their machines. Running is defined as a moving speed approaching 6 mph, the rate at which Garrett's testing shows that the touch sensor failed for the majority of the participants in his study. In his deposition, Bayer

testified that he used his Precor treadmill at a speed of over 5 mph. *See,* ECF No. 149, Ex. 17 at 30:20-31:14. Mednick's testimony is less certain. He did not testify as to a speed at which he used the Precor machine in dispute here. However, he stated that during a period of physical rehabilitation close in time to when he purchased the Precor machine, he got up to speeds of 4.2 or 4.3 mph on another treadmill. *See,* ECF No. 149, Ex. 18 (Mednick's Dep.) at 21:2-22:6.

While neither Mednick nor Bayer said that they ran as fast as 6 mph on their treadmills, there is nothing magical about this number. Garrett tested the treadmills at discrete speeds, including that at 4 mph and 6 mph. His investigation shows that the heart rate monitors began to fail at 4 mph; the failure rate became more pronounced at 6 mph where more than 50% of Garrett's subjects could not get an accurate heart rate reading. However, there is no reason to think that the heart rate monitors' performance exhibits a discontinuity near 6 mph, so that the more-than-50% failure only occurs at a speed of 6 mph but stays acceptably low at any speed below that. In addition, while a 50% threshold is significant because it then becomes more likely than not that the touch sensor would fail for a user this is not to imply that anything less than a 50% failure rate means that the technology performs as advertised. Both Mednick and Bayer used their machines at some speed in excess of 4 mph, a pace at

which the heart rate monitors have begun to fail for a significant fraction of the test subjects. The Court does not think that it should deny class certification simply because Plaintiffs failed to pick up their feet a little more.

Second, even if Mednick and Bayer – or any other class members – do not run on their treadmill, this does not mean that they could not have been deceived or injured by Precor's deceptive advertising. Regardless of whether they run, class members paid for treadmills incorporating heart rate monitors that have been advertised to work. While an inflated payment is not in itself sufficient to state a cause of action under the ICFA (see the discussion on *Zekman,* 182 Ill. 2d at 375, and the related cases, *supra*), it is sufficient when coupled with the fact that class members were exposed to materially deceptive advertising and thereby deceived.

This principle can be gleaned from a recent decision by the Seventh Circuit. In *In re IKO Roofing Shingle Prods. Liab. Litig.,* 757 F.3d 599, 599-600 (7th Cir. 2014), the court dealt with a class action where purchasers of the defendant's roofing shingles alleged that the defendant falsely told them that the shingles met a specific standard. The court recognized that despite the misrepresentation, the defendant's tiles may fail for reasons having nothing to do with how well they were constructed. *See, id.* at 601 (naming tornadoes, hurricanes,

storms, and poor installation as some of the factors that may cause the tiles to fail). "At the same time," said the court, "some tiles that flunk the D225 standard will last indefinitely." *Id.* Nonetheless, the court concluded that the district judge was wrong to deny class certification simply because the above is true. *Id.* at 604.

As the Seventh Circuit explained, under one theory of damages, "every purchaser of a tile is injured (and in the same amount per tile) by delivery of a tile that does not meet the quality standard represented by the manufacturer." *In re IKO,* 757 F.3d at 603. Damages in this case would be calculated as "the difference in market price between a tile as represented and a tile that does not satisfy the D225 standard." *Id.* Crucially, "this remedy could be applied to every member of the class" regardless of whether their shingles actually failed. *Id.*

The same theory of damages found in *In re IKO* applies in this case. A Precor machine whose touch sensor heart rate monitor does not work and yet the user never finds out because he never runs is the equivalent of a tile flunking the D225 standard and yet lasting indefinitely. The putative class member who only walks, like the purchaser of an indefinitely lasting tile, nonetheless has a claim for damages. Therefore, regardless whether they only walk or both walk and run,

Plaintiffs Mednick and Bayer's claims survive any defense Precor may mount as to injury.

Third, there is nothing in the record to suggest that Mednick and Bayer are atypical for not running above 6 mph. Both Plaintiffs used the machines at approximately the same speed, four to five miles an hour, thus suggesting that they are at least similar to each other. Moreover, as long as Plaintiffs are not unique in only walking on their machines, the Court will not withhold class certification even if class members who only walk fail to sustain a claim under the ICFA. This is because "[i]f very few members of the class were harmed, that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate" Precor. *Suchanek,* 764 F.3d at 757-58.

In sum, the Court finds that Plaintiffs' proposed class action satisfies Rule 23(a).

### E. Predominance

The Court now examines the remaining requirements of Rule 23(b)(3). Under Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to the class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). Having identified "questions of law or fact common to the class members," the Court here looks to see if there are "questions affecting only individual

members" that would overwhelm issues common to the class. In this case, there are two such possible obstacles: (1) whether in submitting an old report on damages, Plaintiffs have carried their burden of showing that damages are measurable across the entire class; and (2) whether in seeking certification of a class that spans five states, Plaintiffs have strayed into territory where class treatment is inappropriate because "recovery depends on law that varies materially from state to state." *In re Mex. Money Transfer Litig.,* 267 F.3d 743, 746-47 (7th Cir. 2001).

### 1. Whether damages are susceptible of measurement across the entire class

"In determining whether to certify a consumer fraud class, the court should begin with a rigorous analysis into whether the plaintiffs' damages are susceptible of measurement across the entire class." *Suchanek,* 764 F.3d at 760 (citing *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 14233 (2013)) (internal quotation marks omitted). As part of this "rigorous analysis," the Court must find a model supporting Plaintiffs' damages that is consistent with their theory of liability. *See, Comcast,* 133 S.Ct. at 1433 (holding that "at the class certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case") (internal quotation marks omitted).

Plaintiffs have suggested one such model in their damages report. The damages expert, Schwartz, opined that damages can be calculated on a classwide basis in the following manner. First, Schwartz worked to identify a product comparable to the Precor class products but that does not feature a touch sensor heart rate monitor. Second, through various methods, Schwartz proposed to compute the fraction of the price difference between the Precor products and the comparable product that is attributable to the touch sensor. *See,* ECF No. 149, Ex. 10 ¶¶ 13-20. Schwartz asserted that this difference reflects the harm suffered by each class member because "the class members paid for a feature of value, the touch sensor, which is alleged to not have any actual value." *Id.* ¶ 12.

Schwartz's reliance on the allegation that the touch sensor does not have *any* value is problematic. Such an allegation does not correspond to Plaintiffs' current theory of liability. Plaintiffs currently do not contend that the touch sensor is worthless because it fails to measure the heart rates for all people for all exercise intensities. Instead, Plaintiffs' theory of liability is focused on the fact that the touch sensor fails for a significant fraction of people when they run on the treadmills. According to Plaintiffs' own theory then, it is not the case that the touch sensor has no value. It has value for a user who knows either that he always walks or that his

physiology or fitness is such that he falls into the 45% of users for whom the machines work even at 6 mph (and possibly higher speeds). Such a touch sensor has less value than a sensor that works for all users at all speeds but not zero value.

Schwartz is not to blame for having advanced a damages calculation that, in its details, fails to conform to *Comcast*. Schwartz's report was written more than a year ago and submitted with Plaintiffs' original Motion for Class Certification. At that time, Plaintiffs had not focused their claims on the record showing that the touch sensor heart rate monitors fail at a speed of approximately 6 mph. The report may well have been adequate when it was written.

Even now, the opinion is sound in its general outlines. Damages on a classwide basis can be computed by identifying a comparable product (or products) and calculating the pertinent price difference between this comparable product and the class products. Such a measure implements the theory that a class member's damages are "the difference between the actual value of the package she purchased" and "the inflated price she paid" thinking the product was as advertised. *See, Suchanek,* 764 F.3d at 760 (advancing the above as a damages measure that is calculable classwide); *see also, Goldemberg v. Johnson & Johnson Consumer Cos.,* 317 F.R.D. 374, 394 (S.D.N.Y. 2016) ("Calculating

a price premium can be as simple as computing the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label).").  This is nothing more than the usual expectations damages in the context of a breach-of-contract action.

Plaintiffs simply need to make some adjustments to their current damages model.  They would need either to adjust the product that is identified as comparable to the class products or attribute a smaller portion of the price difference to class members' damages as caused by Precor's alleged misrepresentations.  Based on the record before it, the Court finds that Plaintiffs are capable of carrying out such an analysis.  Moreover, even if the purchase price varies across individual class members, Plaintiffs should be able to compute actual damages as a percentage of the purchase price.  The dollar amount of damages for each class member then can be ascertained at the individual hearings.

Everything considered, Plaintiffs have carried their burden to show that damages are computable on a classwide basis.

### 2. Whether individual issues predominate because the consumer fraud statutes vary materially from state to state

Since the Court denied their original Motion for Class Certification, Plaintiffs have worked to assuage the concern

that the consumer fraud laws of the different states vary too much to allow for class treatment.  In this renewed Motion, Plaintiffs have narrowed their proposed class from ten to five states and cited relevant state-specific authorities to convince the Court that the consumer fraud statutes are largely uniform across the remaining states of California, Illinois, Missouri, New York, and New Jersey.

Precor, on the other hand, has not offered very much that is new or that serves directly to rebut Plaintiffs' arguments. It continues to rely on Seventh Circuit case law for the general proposition that "[n]o class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1015 (7th Cir. 2002).  This is undoubtedly so, but the question then is whether the legal rules of the relevant states are sufficiently "the same" in this case.

Having perused cases discussing the various states' consumer fraud laws, the Court is persuaded that the differences among the states are manageable.  For example, while the statutes of limitations range from three to five years among the relevant states, Plaintiffs have limited the class periods so as to exclude individuals who made purchases outside the limitations period. *See,* ECF No. 149 at 14; *see also, Fournigault v. Indep. One Mortg. Corp.,* 234 F.R.D. 641, 647

(N.D. Ill. 2006) (finding that "individual issues of whether a subclass member's claim is time-barred cannot predominate, because persons that are time-barred will not be class members" due to the class definition). Likewise, although the allowable recoveries differ across the states, the Court has taken the punch out of such variations by confining the issue of damages to individualized hearings.

Other differences among the states do not make class certification improper at this stage. One such difference is the fact that Missouri adopts a laxer standard of review for class certification. While Missouri's law governing class actions is "essentially identical" to Rule 23 of the Federal Rules of Civil Procedure, in Missouri "the determination of class certification is based primarily upon the allegations in the petition." *Hope v. Nissan N. Am., Inc.,* 353 S.W.3d 68, 74 (Mo. Ct. App. 2011). Moreover, those allegations "are accepted as true." *Id.* (internal quotation marks omitted). Although this stands in contrast to the legal standard so far applied in this memorandum opinion, it is a difference that would have favored Plaintiffs. Since Plaintiffs satisfy a stricter standard of review, that they would have had an easier time under Missouri law does not affect the outcome here.

Similarly, New Jersey has a more liberal consumer protection statute than Illinois when it comes to the issue of

proximate causation. New Jersey adopts a "benefits of the bargain" rule where, to show that consumers were injured by a defendant's deceptive act, class plaintiffs only need to establish that "they paid for a product and got something less than what had been promised." *In re Mercedes-Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 73 (D.N.J. 2009) (internal quotation marks omitted). New Jersey thus seems to accept the "market causation" theory that Illinois rejects. But because the Court has limited the misrepresentations that Plaintiffs may rely on to those that were seen by all class members, this variation in the laws of Illinois and New Jersey does not create a problem. Illinois consumers here are not pinning their hopes on "market causation" or other people having been exposed to the alleged misrepresentations. They saw the treadmills with those misrepresentations themselves.

Overall, the consumer protection statutes of California, Illinois, Missouri, New York, and New Jersey share sufficient common characteristics that class certification as to the issue of liability is appropriate in this case. *See,* ECF No. 149, Ex. 20 (outline by Plaintiffs of the elements required under the states' consumer fraud acts). Another court in this district has recently certified a consumer fraud class action spanning four out of the five states Plaintiffs seek here. *See, Suchanek,* 311 F.R.D. at 264 (certifying a consumer fraud class

covering the residents of California, Illinois, New Jersey, and New York among others). The Court adds Missouri to the mix but arrives at the same conclusion.

To conclude, the Court finds that Rule 23(b)(3) is satisfied. The proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. Since the Court already has found that the requirements of Rule 23 are met, it certifies the class as to the common issue identified.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs' Renewed Motion for Class Certification [ECF No. 149] is granted in part and denied in part. The Court hereby orders the following: (1) certification of Plaintiffs' proposed five-state class as to the issue of liability; (2) appointment of Plaintiffs Mednick and Bayer as class representatives; and (3) appointment of Katrina Carroll, Joseph J. Siprut, and Richard Gordon as class counsel.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: March 16, 2017